United States Court of Appeals,

Eleventh Circuit.

No. 94-9220.

Phyllis WATKINS, Plaintiff-Appellant,

v.

Ralph T. BOWDEN, Jr., Individually and in his official capacity as DeKalb County Solicitor;  DeKalb County, Georgia, Defendants-Appellees.

Feb. 18, 1997.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:91-cv-1737-ODE), Orinda D. Evans, Judge.

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and GODBOLD, Senior Circuit Judge.

PER CURIAM:

In this appeal, we affirm the district court's entry of judgment for appellees Ralph Bowden and DeKalb County, Georgia, on appellant Phyllis Watkins's constitutional claims brought pursuant to 42 U.S.C. § 1983.

FACTS

On January 15, 1990, Phyllis Watkins, an African-American female, began work as an assistant solicitor (assistant) in the Office of the Solicitor of DeKalb County (the office). [1]  Ralph Bowden, solicitor of the county, had hired Watkins the preceding week.  Bowden informed Watkins, the only African-American lawyer in the office, that she was subject to a six month probationary period and that he expected a two-year commitment from her.  Watkins's employment lasted until March 15, 1990;  the parties sharply

---

[1]Assistants process and prosecute individuals charged with misdemeanors in DeKalb County (the county).

dispute the events surrounding her tenure.  During a jury trial, witnesses testified to the following factual scenarios.

Phyllis Watkins

Watkins testified that she experienced a series of occurrences during her second week of work that she "found ... to be a little strange and/or offensive."  The office receptionist questioned her if "black people have to wash their hair every day."  One of the office's investigators inquired whether Watkins's hair was real and whether she had to comb it daily.  Assistant Lisa Heiszek asked Watkins if her ancestors were from Nigeria because she "could hear Nigerian in [Watkins's] voice."[2]  Ann Elmore, an assistant and the office's "trial specialist," asked Watkins "why was it that when black people and Japanese people have babies together, the babies are considered black, but when white people and Japanese people have babies together, the babies are considered white?"

On another occasion, Watkins overheard two assistants, Andy Rogers and Andrew Fernandez, her trial partner, laughing at the prospect of buying a house near Carver High School, which is located in a neighborhood of Atlanta populated predominantly by African-Americans.[3]  Watkins also overheard Rogers, Fernandez, and another assistant, Neal Bevans, discussing the film "Mandingo"; Fernandez stated that if "[y]ou watch that movie, ... you are just going to go, "Oh my God.' "  Watkins testified that she perceived

---

[2]Watkins was born and raised in Georgia, and her family has lived there for generations.

[3]Fernandez testified that he did not have any recollection of this conversation and did not know the location of the school.

Fernandez's comment as a statement on "a stereotype of black men, that black men are supposed to have big genitals."[4] Watkins also heard her secretary, Robin Clements, telling a joke comparing Jesse Jackson to Buckwheat, the television character. Watkins told Clements not to "tell black jokes in here," and Clements apologized.[5]

Watkins testified that she discussed these occurrences at the end of her second work week with Cliff Howard, the chief assistant solicitor of the office. According to Watkins, she informed Howard that the sexual and racial context of her colleagues' comments offended her. She testified that Howard told her that he would talk to Bowden about their conversation and speak to the responsible individuals. Watkins also testified that during this meeting Howard told her that one of his relatives was associated with the Ku Klux Klan.

After this initial meeting with Howard, Watkins continued to endure offensive incidents. While at lunch with four male colleagues, assistants Rogers, Gary Bergman, and Brad Malkin, and investigator David Newbern, "[t]he conversation turned to the size of Jewish men's penises, that they were small, and after a few minutes of this, they all turned to me, and I believe Gary Bergman asked me if it was true what they said about black men." The men laughed at this question; Watkins explained that she was offended by the comments and "shocked that somebody would ask me that

---

[4]Fernandez denied that this incident took place.

[5]Clements's testimony corroborated Watkins's account of the incident.

question."[6]  On another day, upon Watkins's return to the office following a weekend vacation with her husband, Rogers asked her, in front of Howard and assistant Judy Emken, "Well, what was sex like with your husband?  I'm sure they had to put you in a building that was all the way to the end because there was just a whole lot of yelling and screaming going on."  Howard laughed at Rogers's remark.[7]

Regarding Emken, Watkins recounted that "there were constant jokes about her hair, that she was a fake blond[e], that she was dumb.  Also, [other assistants] asked her questions all the time about her boyfriend, and her relationship[s] with her boyfriend."  Howard informed Watkins that he had engaged in a sexual relationship with Emken.  Watkins also testified that colleagues repeatedly made derogatory remarks regarding the competence of Judge Linda Hunter, an African-American female, who, at the relevant time, served as a state trial judge and presided over matters the office handled.

Later, Watkins assisted Fernandez on a case involving a Nigerian defendant.  According to Watkins, after a witness provided testimony favorable to the defendant, Fernandez said, "I wish they would all go back."[8]  On another day, when Watkins told Fernandez that she volunteered at a rape crisis center, Fernandez responded,

---

[6]Rogers testified that the statements occurred, but that Watkins responded to the questions in an "excited" manner and was "very willing to engage in this topic of conversation."

[7]Rogers testified that he "would not ask a question like that."

[8]Fernandez denied that he made this statement.

"Well, where can I go to get raped?"[9]

Watkins testified that following these incidents she again reported her concerns and dissatisfaction to Howard. According to Watkins, Howard expressed that "these were his friends, that I was taking all of this stuff out of context, and that once I got to know them better, that I would see they were only trying to get to know me as a person."

Watkins testified that after five weeks on the job she continued to hear comments she considered offensive. She maintained that the comments regarding Emken and Judge Hunter "were almost daily nonstop." Moreover, upon entering Malkin's office one day, the assistant told Watkins that the black trash can on his desk was a phallic symbol. When Watkins reported this incident to Howard, Howard laughed about it. Watkins also testified that Bevans would "constantly" mimic, to the amusement of colleagues, what he perceived as the speech patterns of African-Americans. In addition, Watkins related that one day Howard came up behind her, placed his face a few inches from her head, and smelled her hair. He stated that Watkins's "hair smells good. It smells like coconut." Watkins further testified that Fernandez and Howard once invited her to accompany them to a strip club.

As a result of these episodes, Watkins suffered from depression and anxiety; she received medical treatment for her depression in 1991. Watkins testified that she articulated her frustrations about the office to assistant Deborah Blum and former

[9]Fernandez testified, "I never made that statement. I would never make that kind of statement."

assistant Greg Adams.[10]  She also received counselling from her
minister, Dr. Earl Moore.  Watkins acknowledged that she sought out
Dr. Moore's advice in part because of his affiliations with the
Southern Christian Leadership Conference (SCLC) and the Concerned
Black Clergy;  she believed Dr. Moore could advise her well on what
course of action to take concerning the office's environment.  Two
weeks before her termination, Watkins met with Dr. Moore because
"the situation in the solicitor's office had gotten so bad, and I
felt this situation was greater or bigger than just my employment."
Watkins had concerns that future female and minority group member
assistants would face the same atmosphere in the office.  Dr. Moore
and Watkins agreed on a plan of action—Dr. Moore gave Watkins a
list of civil rights leaders to contact and stated that he would
also contact community leaders and arrange for Watkins to meet with
them.  Watkins testified that she did not follow through with the
plan because she "was fired before [she] was able to get to the
people."[11]

On March 15, 1990, all the assistants and Bowden attended a
Decatur-DeKalb Bar Association luncheon.  The luncheon speaker made
several "jokes about females and ... black people" which Watkins
found inappropriate, including, for example, that "women lawyers

---

[10]Watkins also testified that she did not receive "the
training that was promised" and thus was not given the
opportunity to develop as a prosecutor.

[11]Watkins recounted that after she was fired she contacted
two officials of the National Association for the Advancement of
Colored People (NAACP), a Georgia congressman's office, the SCLC,
and Manuel Maloff, Chairman of the DeKalb County Commission.  She
also filed a complaint with the Equal Employment Opportunity
Commission (EEOC).

are to the practice of law as women drivers are to the traffic flow."[12]  After the luncheon, Watkins told Bowden that she found the comments offensive and asked what he felt about the speaker's presentation.  According to Watkins, Bowden "thought the speech was offensive because black people were in the audience."[13]  Later that afternoon, Bowden informed Watkins that she was being terminated.  According to Watkins, Bowden stated that he was firing her because she (1) did not know the Federal Rules of Evidence;  (2) did not get along with Elmore;  (3) dressed inappropriately for court;  (4) could not take criticism well;  and (5) could not operate under pressure.  Watkins testified that she told Bowden, "I knew why I was being terminated, because I constantly complained about the behavior of my colleagues in the office."  In response, Bowden told Watkins that she should have ignored the behavior and comments of others and focused on developing her prosecutorial skills.  Watkins asked Bowden for the opportunity to work another month, but he refused, stating that she would "never be able to function as a prosecutor."  Bowden, however, gave Watkins the opportunity to resign, which she did.

 David Newbern

Newbern testified that "[w]ithin the office ... there was a very probing nature into everybody's sexual relationships.  There were many sexual jokes that were told within the office, and also

---

[12]Several witnesses testified that they also found the speaker's comments insulting.

[13]Watkins had the "impression that what ... Mr. Bowden was saying was that if no blacks had attended this meeting, that it would have been okay to say these ridiculous things."

there were many occasions of ... racial jokes." Newbern's testimony corroborated Watkins's version of events at the lunch with Rogers, Bergman, and Malkin; Newbern stated that with "Watkins being very new in the office at that time, she didn't respond" to the offensive statements. Newbern also confirmed Watkins's allegations concerning their colleagues' repeated derogatory comments about Judge Hunter. He testified that employees contended Judge Hunter "was incompetent to be in the position of judge, and often they thought she got that position because she is a black female.... [I]n general there seemed to be anger towards Linda Hunter." Newbern also explained that he heard "an assistant solicitor mimicking defendants who had been in court, and plaintiffs who had been in court; in particular, blacks who were from a lower income group, and this was fairly commonplace that joking of this nature went on." In response to the mimicking, "[g]enerally people laughed, kind of played along."

 Gwendolyn Steel-Hill

Steel-Hill, an African-American female and one of the office's investigators, testified that colleagues told sexual and racial jokes during the period of Watkins's employ. "The sexual jokes were about male sex organs, women who weren't getting any. The racial jokes tended to be mimicking or making fun of blacks." She confirmed that comments were made in the presence of Watkins about "black men having larger sexual organs than white men" and about Emken's sexual activity. Steel-Hill observed Watkins crying in the office on three occasions. She believed, and told Watkins, "that there were people in the office that would like to see her fail."

Steel-Hill heard colleagues joke about the smell and texture of Watkins's hair; she also heard Howard ask Watkins whether her hair was real.

## Dr. Earl Moore

Dr. Moore testified that approximately three weeks after Watkins had started work in the office, he noticed a "look of sadness on her face" and inquired if she had any problems. In response, Watkins admitted to her difficulties on the job. The two engaged in prayer together, and their meeting ended. A few weeks later, Dr. Moore noticed that Watkins "was looking distressed," and he asked about conditions at the office. The two conferred about the situation; Dr. Moore informed Watkins that she "need[ed] some advocates." "I suggested to her that she go to the NAACP, the SCLC, and I told her that I would take it to the Concerned Black Clergy, and I suggested that she go to the EEOC...." Dr. Moore testified that Watkins "indicated that she intended to" carry out this plan. Dr. Moore never contacted Bowden.

## Ralph Bowden

Bowden testified that he expects Howard to communicate with him and that the two "have a policy of keeping each other well informed on everything that's going on in the office of any significance." Indeed, Bowden and Howard meet regularly to discuss matters that occur in the office. Though the office has no written policies concerning sexual or racial harassment, Bowden believes that Howard "certainly" would tell him about any harassment issues. He stated that if Watkins heard any statements that offended her, and articulated that to Howard, "then he certainly ought to come

tell me about that."  Bowden stated that he has an "open door" policy and that assistants are free to come to him with problems or concerns.  He noticed that Watkins appeared sad and depressed in the office.  He denied, however, knowing about any of the comments or incidents that Watkins allegedly endured.  He stated that if those comments had been made he would have wanted to know about them.  Bowden also remarked that if the comments occurred, and Watkins told Howard about them, he "absolutely" would have expected Howard to communicate this to him.

As to the training provided in the office, Bowden stated:

> We don't train our assistants.  The process of going from being a new lawyer to becoming an assistant solicitor maybe contains 10 or 15 percent of what we would call training; that is, sitting down with somebody and showing them how to fill out a form, showing them how to use the accusation form book.  We don't really have a training program....  We give you an opportunity to learn how to be an assistant solicitor, and you do that by observing and doing.

Around March 1, 1990, Bowden received a telephone call from Judge Jack McLaughlin (before whom Watkins had appeared), who stated that Watkins needed supervision and was not ready to be left alone in the courtroom.[14]  Around the same time, Elmore told Bowden that they had a "very serious problem" in Watkins.  Elmore relayed to Bowden that Watkins had (1) walked out of the courtroom on one occasion in a pouting and sullen mood;  (2) failed to keep appointments with her;  and (3) continually made the same mistakes and thus was failing to progress as a prosecutor.  Bowden testified that before terminating Watkins, "I think I talked to every assistant in that office, everyone who had been there for more than

_____

[14]Judge McLaughlin corroborated Bowden's testimony regarding this conversation.

a year.  So, I had an office full of experienced prosecutors, and I talked to every one of them about the problem, yes."  Bowden maintained that no one, including Howard, told him that Watkins had complained about sexist and racial comments made in the office. Instead, all the assistants commented on "fundamental problems" having to do with Watkins's performance as a prosecutor.  Bowden did not speak to Watkins concerning her performance before terminating her employment.  He denied that Watkins discussed at the termination meeting any of the occurrences about which she testified.  Bowden reported that Watkins responded to her termination with a sense of relief.  He granted her request that she be permitted to resign.

 Cliff Howard

Howard testified that pursuant to office structure assistants go to him with day-to-day problems;  if he is not available, they go directly to Bowden.  He expressed that his "job is to make a decision about what problems to go talk to Ralph about, and which ones not to go talk to [him] about."  He testified that if there were complaints about sexual or racial harassment, "I would bring that to Ralph's attention."  Howard confirmed that Watkins came to him after two or three weeks on the job and had concerns about (1) colleagues' comments about her hair;  (2) Rogers's and Fernandez's remarks about living near Carver High School;  and (3) the conversation surrounding the film "Mandingo."  Howard did not relate Watkins's concerns to Bowden.  He testified that approximately two weeks after this initial meeting, Watkins approached him and told him, "No one here is a racist.  I really

like all the people I work with."

Howard explained that he did not take any action after Watkins later complained to him about Bevans mimicking African-Americans because "when we had the discussion about that's how Neal deals with situations, he mimics everybody, he has mimicked everybody in the office, she seemed to be satisfied with that statement." He also testified that Watkins approached him about Emken and was concerned about the "hard time" Emken was given. Howard told Watkins that Emken had made no indication that she viewed any behavior toward her as a problem. After this second meeting, Howard "didn't think [the situation] rose to the level of something I needed to bring to Mr. Bowden's attention." Howard denied that he told Watkins about his relationship with Emken and that a family member of his was involved in the Ku Klux Klan. He also denied that he ever asked Watkins to accompany him to a strip club. Howard had no recollection of Rogers's comments concerning Watkins's vacation weekend. He further denied coming up behind Watkins and smelling her hair. He also reported that he never observed Watkins looking upset in the office.

After Bowden informed Howard that Judge McLaughlin had called about Watkins's performance, Howard talked to "several assistants [who] had worked with Phyllis." Howard testified that he and Bowden had "between 10 and 35 discussions" about the decision to terminate Watkins prior to her firing. Howard never mentioned any of Watkins's complaints to Bowden during these discussions. Rather, the two men discussed Watkins's "ability to perform the job."

PROCEDURAL HISTORY

In July 1991, Watkins instituted this lawsuit against Bowden and the county (collectively, "appellees") in the United States District Court for the Northern District of Georgia, alleging an array of federal constitutional claims and one state tort law cause of action. Appellees subsequently moved for summary judgment; in February 1993, the district court granted appellees' motion in part and denied it in part. Four of Watkins's claims against appellees, all brought pursuant to 42 U.S.C. § 1983, survived the court's order: (1) a retaliatory discharge claim under the First Amendment based on her complaints of sexual and racial harassment; (2) a retaliatory discharge claim under the First Amendment based on her complaint about the speech given at the bar luncheon; (3) a retaliatory discharge claim under the Equal Protection Clause based on her complaints of sexual and racial harassment; and (4) a hostile work environment sexual and racial harassment claim under the Equal Protection Clause. On appeal, this court found that Watkins "failed to establish that defendant Bowden violated clearly-established First Amendment law" and thus "reverse[d] the judgment of the district court only insofar as it failed to grant summary judgment to Bowden on plaintiff's First Amendment claim[s]." *Watkins v. Bowden,* 28 F.3d 118 (table), No. 93-8779, slip op. at 2 (11th Cir. June 30, 1994) (unpublished opinion).

Watkins tried her claims before a jury in September 1994. At the close of Watkins's case, the district court granted directed verdicts for appellees on all of her claims except the hostile work environment sexual and racial harassment allegation against the

county.  As to that claim, the court instructed the jury, in relevant part, that:

> Whether the harassment was sufficiently severe as to alter the conditions of the plaintiff's employment is viewed from the standpoint of a reasonable African American or woman; that is, whether a reasonable African American or woman would find such harassment sufficiently severe so as to alter the conditions of employment and create an abusive working environment.
>
> In addition to showing that an abusive working environment existed from an objective standpoint, the plaintiff must also prove that she actually perceived the environment as hostile and abusive as well.

After the jury retired with instructions not to begin deliberations, counsel for the county objected to the above instruction, arguing that *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), mandated that the court instruct the jury to assess the alleged harassment from the perspective of a "reasonable person."  Counsel persuaded the court of their position;  accordingly, the court called the jury back into the courtroom and stated:

> Members of the jury, it has been called to my attention that I gave you one inaccurate instruction.  I instructed you that in determining whether an abusive or hostile work environment existed, that you would use an objective test looking through the eyes of a reasonable African American or woman.  That was not correct.
>
> The correct test is you look to see whether, objectively speaking, a hostile working environment existed looking through the eyes of a reasonable person.
>
> In addition to that, as I previously told you, you also look to see whether the evidence shows that the plaintiff actually perceived the environment as abusive and hostile as well.

The jury returned a verdict for the county.  This appeal followed.

## CONTENTIONS

Watkins first contends that the district court erred in

granting a directed verdict for the county on her claim of retaliation under the First Amendment for her complaints of sexual and racial harassment because those complaints affect a matter of public concern and the evidence gives rise to an inference that Bowden (and thus the county) knew or had notice of those complaints. Watkins also insists that the court erred in granting the county a directed verdict on her retaliation claim under the First Amendment for her complaint regarding the bar luncheon speaker because the evidence justifies an inference that Bowden terminated her with a retaliatory motive. Next, Watkins asserts that the court erred in granting appellees' motion for a directed verdict on her claim of retaliation under the Equal Protection Clause because, again, the evidence gives rise to a reasonable inference that Bowden had knowledge or notice of her complaints of sexual and racial harassment. Lastly, Watkins argues that the court's corrective jury instruction employing a "reasonable person" standard for evaluating whether a hostile work environment existed was erroneous and highly prejudicial.[15]

Appellees respond to Watkins's contentions as follows. First, the court properly granted appellees judgment as a matter of law on Watkins's retaliation claims because she did not present sufficient evidence from which a reasonable jury could infer that Bowden had knowledge of her complaints. Without knowledge of Watkins's complaints, Bowden could not have formed the required

---

[15]This contention only affects Watkins's claim against the county. Watkins did not appeal the district court's grant of a directed verdict for Bowden on her hostile work environment claim.

retaliatory motive.   Moreover, the court correctly held that Watkins's complaints regarding allegedly offensive conduct in the work place did not amount to a matter of public concern sufficient to trigger the protection of the First Amendment.  As for Watkins's claim that Bowden terminated her in retaliation for her complaint concerning the bar luncheon speaker, the court properly held that Watkins presented insufficient evidence from which a reasonable jury could conclude that Bowden harbored the required unlawful retaliatory motive.  In addition, as a matter of law Watkins cannot state a "generic" retaliation claim under the Equal Protection Clause.  Finally, the court properly instructed the jury on the objective component of the standard for evaluating hostile work environment claims;  indeed, *Harris* compels the "reasonable person" instruction.[16]

---

[16]Watkins presses two other issues that we reject in summary fashion.  First, she argues that the district court erred in refusing to admit Steel-Hill's proffered testimony concerning alleged retaliation against her in 1992 and the proffered testimony of Yvonne Twyman-Williams, an African-American female who served as an assistant in the office from January 1992 to April 1993.  Twyman-Williams intended to testify about the office's atmosphere and alleged retaliation against her during her tenure.  The district court possesses broad discretion in determining the admissibility of evidence, and this court will not disturb its rulings absent a clear showing of an abuse of discretion.  *Lanham v. Whitfield,* 805 F.2d 970, 972 (11th Cir.1986).  The district court reasoned that both witnesses' proffered testimony was (1) too far removed in time from the period that Watkins worked in the office, and (2) not sufficiently similar to Watkins's allegations to merit admission under Federal Rule of Evidence 404(b).  The record confirms that the district court's ruling did not constitute an abuse of discretion.

Second, Watkins contends that the district court's questioning of Newbern indicated to the jury that the court believed that the assistants were merely "joking around" when they engaged in sexual or racial banter, and, therefore, the court overstepped its bounds of discretion

DISCUSSION

A. First Amendment Retaliation Claims

The district court relied on two grounds in directing a verdict for the county on Watkins's First Amendment retaliation claim based on her complaints of sexual and racial harassment. First, the court found that no evidence of substance existed that Bowden knew of Watkins's complaints. Second, the court did not find that "the complaints that Mrs. Watkins related to Mr. Howard r[o]se to the level of First Amendment concern." We first address the district court's second holding, because if Watkins's complaints did not affect a matter of public concern, her First Amendment claims must fail.

> A state may not demote or discharge a public employee in retaliation for protected speech. This circuit has developed a four-part test to determine whether an employee suffered such retaliation. First, a court must determine whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern. If so, the district court must weigh the employee's first amendment interests against the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees. Should the employee prevail on the balancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to demote or discharge the employee. Finally, if the employee shows that the speech was a substantial motivating factor in the employment decision, the

---

and assumed an advocate's role. A trial judge retains the authority to question witnesses but can abuse that authority by assuming the role of an advocate. *Hanson v. Waller,* 888 F.2d 806, 812 (11th Cir.1989). Counsel for Watkins, however, never objected, even out of the presence of the jury, to the questions the court posed to Newbern. "[W]here a party fails to object in a timely manner, i.e., at the next available time when the jury is not present, objection to the alleged error will be deemed waived unless it constitutes plain error." *Hanson,* 888 F.2d at 813. The record does not reveal that the court strayed from neutrality; thus, the court did not err (much less plainly err) in its questioning of Newbern.

> state must prove by a preponderance of the evidence that it
> would have reached the same decision even in the absence of
> the protected conduct.

*Morgan v. Ford,* 6 F.3d 750, 753-54 (11th Cir.1993) (quotation
marks, citations, brackets, and ellipsis omitted), *cert. denied, --
- U.S. ----,* 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994). "The
threshold question of whether an employee's speech may be fairly
characterized as constituting speech on a matter of public concern
is a question of law, subject to *de novo* review by this court."
*Deremo v. Watkins,* 939 F.2d 908, 910 (11th Cir.1991).

For an employee's speech to rise to the level of public
concern, it must relate to a matter of political, social, or other
concern to the community. Therefore, this court must determine
whether the purpose of Watkins's speech was to raise issues of
public concern or to further her own private interest. *Morgan,* 6
F.3d at 754. In making this determination, we consider the
content, form, and context of the employee's statements, the
employee's attempts to make the concerns public, and the employee's
motivation in speaking. *See Morgan,* 6 F.3d at 754; *Deremo,* 939
F.2d at 910-11.

We are convinced that Watkins's speech did not constitute
speech on a matter of public concern. Watkins lodged her
complaints to Howard privately and informally, and those complaints
focused primarily on how her colleagues "behaved toward her and how
that conduct affected her work." *Morgan,* 6 F.3d at 755. Moreover,
Watkins's discussions with Blum, Adams, and Dr. Moore did not draw
the public at large or its concerns into the picture. *Morgan,* 6
F.3d at 755. Indeed, Dr. Moore's testimony revealed that he

initiated their discussions about the office's environment. Furthermore, Watkins's expression of concern over her colleagues' treatment of Emken was made in her capacity as employee, rather than in her "role as citizen." *Kurtz v. Vickrey,* 855 F.2d 723, 727 (11th Cir.1988).

Watkins's complaints have a far more private and informal flavor than the employee's speech at issue in *Morgan.* In that case, the plaintiff, Jacqueline Morgan, a correctional officer at the Augusta Correctional Medical Institute (ACMI), (1) served as a witness for a colleague who had pursued a sexual harassment complaint against Morgan's immediate supervisor, John Ford; (2) told the Superintendent of ACMI of Ford's harassing behavior toward her; (3) pressed charges against Ford with the Georgia Department of Corrections Internal Affairs Division; and (4) filed a sexual harassment charge against Ford with the Georgia Office of Fair Employment Practices. *Morgan,* 6 F.3d at 752-53. This court sustained the district court's entry of summary judgment against Morgan on her section 1983 claim, finding that "the main thrust of her speech took the form of a private employee grievance." *Morgan,* 6 F.3d at 755. Morgan's complaints did not rise to the level of public concern; consequently, Watkins's speech certainly falls below that mark.

Watkins's other First Amendment claim, which alleges that Bowden (and thus the county) terminated her in retaliation for her complaint about the bar luncheon speaker, fails for the same

reason.[17] Watkins's informal and private comment to Bowden that she found the speaker's comments offensive, without more, does not constitute speech affecting a matter of public concern.[18] Thus, we affirm the district court's order granting directed verdicts for the county on Watkins's First Amendment claims.

B. Equal Protection Retaliation Claim

The district court held that "[w]ith respect to the claim that Mrs. Watkins was fired in retaliation for complaints regarding sexual and racial harassment, again, I think there is just not any evidence of substance that Mr. Bowden knew about her performance." Watkins argues that the district court erred in granting appellees' motion for a directed verdict on her claim of retaliation under the

---

[17]The district judge denied Watkins relief on this claim on other grounds, finding that "I just don't think there is evidence in the record to support th[e] claim." "[T]his court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court." *Bonanni Ship Supply, Inc. v. United States,* 959 F.2d 1558, 1561 (11th Cir.1992).

[18]Though Watkins splits her First Amendment allegations into two claims, we note that even if we considered all of her assertions under one First Amendment challenge, we would reach the same conclusion—her speech did not affect a matter of public concern. *See Morgan,* 6 F.3d at 751-55; *see also Cooper v. Smith,* 89 F.3d 761, 765 (11th Cir.1996) (reporting corruption in police department to state bureau of investigation involved issue of public concern); *Martinez v. City of Opa-Locka,* Fla., 971 F.2d 708, 710, 712 (11th Cir.1992) (providing testimony before city commission concerning purchasing practices of city affected matter of public concern); *Stough v. Gallagher,* 967 F.2d 1523, 1524, 1528 (11th Cir.1992) (giving campaign speech at "political forum" on behalf of candidate for sheriff addressed topic of public concern); *Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1506 (11th Cir.1990) (expressing public "opposition to the Superintendent's position on the upcoming tax referendum clearly implicates a matter of public concern"); *Williams v. Roberts,* 904 F.2d 634, 638 (11th Cir.1990) (publishing editorials criticizing county's budget and employment actions implicated matter of public concern).

Equal Protection Clause because the evidence adduced at trial gives rise to a reasonable inference that Bowden knew of her complaints of sexual and racial harassment. Appellees counter that the district court's assessment of the evidence was accurate and, in any event, that Watkins "did not contend, and did not prove, that she, as a female (or African-American) who raised complaints of sexual (or racial) harassment, was treated differently from any male (or white) who raised similar claims." Appellees assert that "[t]he equal protection clause prohibits only such class-based distinctions; it does not, as ... other federal non-discrimination statutes do, prohibit generic "retaliation.' Therefore, [Watkins] failed to prove a violation of the equal protection clause."

We review the district court's granting of a directed verdict motion under the *de novo* standard. *Sherrin v. Northwestern Nat'l Life Ins. Co.,* 2 F.3d 373, 377 (11th Cir.1993). In so doing, we use the same standard the district court employed in determining whether to grant the motion. *See Sherrin,* 2 F.3d at 377; *Lamb v. Sears, Roebuck & Co.,* 1 F.3d 1184, 1187 (11th Cir.1993). Again, "[o]ur review of an order granting a directed verdict is not confined to the grounds relied on by the district court. We will affirm if the district court can be sustained on any grounds." *Weeks v. Remington Arms Co., Inc.,* 733 F.2d 1485, 1490 n. 6 (11th Cir.1984).

Watkins asserts that two elements of her "prima facie case of retaliation under the Equal Protection Clause" are that she "engaged in protected conduct or statements," and that her "termination was based, at least in part, on her membership in a

protected classification."  To the extent Watkins contends that she was dismissed because of her expressive activity, that claim arises under the First Amendment.  *See, e.g., Thompson v. City of Starkville,* 901 F.2d 456, 468 (5th Cir.1990) (dismissing plaintiff's equal protection claim in retaliation case because it "amounts to no more than a restatement of his first amendment claim");  *Vukadinovich v. Bartels,* 853 F.2d 1387, 1391-92 (7th Cir.1988) (finding that plaintiff's equal protection retaliation claim, based on allegation that "he was treated differently because he exercised his right to free speech," "is best characterized as a mere rewording of [his] First Amendment-retaliation claim").  Moreover, to the extent Watkins links her alleged retaliatory dismissal to her gender or race, that allegation constitutes part of her equal protection discrimination (i.e., hostile work environment sexual and racial harassment) claim.  *See, e.g., Beardsley v. Webb,* 30 F.3d 524, 529-30 (4th Cir.1994).  A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause.  *See Ratliff v. DeKalb County,* 62 F.3d 338, 340 (11th Cir.1995) (reversing denial of qualified immunity on equal protection retaliation claim because "[t]he right to be free from retaliation [for making complaints of discrimination] is clearly established as a *first amendment* right and as a *statutory* right under Title VII;  but no clearly established right exists under the *equal protection* clause to be free from retaliation");  *Grossbaum v. Indianapolis-Marion County Bldg. Auth.,* 100 F.3d 1287, 1296 n. 8 (7th Cir.1996) (Equal Protection Clause "does not establish a general right to be free from retaliation");  *Bernheim*

*v. Litt,* 79 F.3d 318, 323 (2d Cir.1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); *Gray v. Lacke,* 885 F.2d 399, 414 (7th Cir.1989) ("Gray's right to be free from retaliation for protesting sexual harassment and sex discrimination is a right created by Title VII, not the equal protection clause."), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Long v. Laramie County Community College Dist.,* 840 F.2d 743, 752 (10th Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988). Consequently, we affirm the district court's grant of a directed verdict for appellees on Watkins's equal protection retaliation claim.

## C. Jury Instruction on the Hostile Work Environment Sexual and Racial Harassment Claim Against the County

In order to prevail on her hostile work environment sexual and racial harassment claim under the Equal Protection Clause, Watkins had to show that (1) she belonged to the protected groups at issue; (2) she was subjected to unwelcome sexual and racial harassment; (3) the harassment was based upon her gender and race; (4) the harassment affected the conditions of her employment; (5) the defendant (the county, as represented by Bowden) acted under color of law; and (6) the defendant acted with discriminatory purpose or intent. *See Cross v. Alabama,* 49 F.3d 1490, 1504, 1507–08 (11th Cir.1995).

The jury instruction at issue involved the fourth element above. As to that element, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working

environment.  *See Harris,* 510 U.S. at ----, 114 S.Ct. at 370;

*Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th

Cir.1995);  *Cross,* 49 F.3d at 1507.[19]  In *Harris,* the Supreme Court

further defined this element, granting "certiorari ... to resolve

a conflict among the Circuits on whether conduct, to be actionable

as abusive work environment harassment ..., must seriously affect

an employee's psychological well-being or lead the plaintiff to

suffer injury."  *Harris,* 510 U.S. at ----, 114 S.Ct. at 370

(quotation marks and brackets omitted).[20]  In deciding this issue,

the Court elaborated on the objective and subjective components of

the hostile work environment inquiry:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—*an environment that a reasonable person would find hostile or abusive*—is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris,* 510 U.S. at ----, 114 S.Ct. at 370 (emphasis added).[21]

---

[19]This requirement exists for plaintiffs whether they bring a hostile work environment claim pursuant to 42 U.S.C. § 1983 (like Watkins) or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.  *See Cross,* 49 F.3d at 1507-08.

[20]The Court held that "[s]o long as the environment would reasonably be perceived, and is perceived, as hostile or abusive ..., there is no need for it also to be psychologically injurious."  *Harris,* 510 U.S. at ----, 114 S.Ct. at 371.

[21]Justice Ginsburg, in her concurring opinion, added:

> [T]he adjudicator's inquiry should center, dominantly, on whether the discriminatory conduct has unreasonably interfered with the plaintiff's work performance....  It suffices to prove that a *reasonable person subjected to the discriminatory conduct would find,* as the plaintiff did, *that the harassment so altered working conditions as to* "ma[k]e it more difficult to do the job."

Despite *Harris,* Watkins contends that the district court erred in instructing that the jury "look to see whether, objectively speaking, a hostile working environment existed looking through the eyes of a reasonable person." She argues that the court's original, more contextual standard, which asked the jury to assess the working environment from the standpoint of a "reasonable African American or woman," was a correct statement of the law and that the substituted instruction caused her prejudicial harm.

"In reviewing the district court's jury instructions, this court will look to see whether the charges, considered as a whole, sufficiently instruct the jury so that the jurors understand the issues involved and are not misled." *Pesaplastic, C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516, 1525 (11th Cir.1985); *see also Cross,* 49 F.3d at 1505. "If the instructions, taken together, properly express the law applicable to the case, no reversible error has occurred, even if an isolated clause may be inaccurate, ambiguous, incomplete, or otherwise subject to criticism." *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir.1991).

Given *Harris,* we cannot conclude that the district court's corrective instruction did not properly express the law applicable to this case.[22] Moreover, the district court clearly identified the

_____

*Harris,* 510 U.S. at ----, 114 S.Ct. at 372 (Ginsburg, J., concurring) (emphasis added) (quoting *Davis v. Monsanto Chem. Co.,* 858 F.2d 345, 349 (6th Cir.1988), *cert. denied,* 490 U.S. 1110, 109 S.Ct. 3166, 104 L.Ed.2d 1028 (1989)) (second alteration in original).

[22]We are aware that several circuits have applied the more contextual standard in hostile work environment actions even after *Harris. See, e.g., King v. Frazier,* 77 F.3d 1361, 1363 (Fed.Cir.) (objective inquiry "require[s] that sexual harassment be judged from the perspective of the one being harassed"), *cert.*

superseded instruction, concisely articulated the corrective instruction, and then restated the subjective component of the hostile work environment inquiry. Therefore, the court's instructions gave the jurors sufficient guidance and did not mislead or confuse them. Accordingly, no reversible error occurred, and we affirm the judgment for the county on Watkins's hostile work environment sexual and racial harassment claim.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

---

*denied,* --- U.S. ----, 117 S.Ct. 62, 136 L.Ed.2d 24 (1996); *Brown v. Hot, Sexy and Safer Prods., Inc.,* 68 F.3d 525, 540 (1st Cir.1995) ("[T]he court must consider not only the actual effect of the harassment on the plaintiff, but also the effect such conduct would have on a reasonable person in the plaintiff's position."), *cert. denied,* --- U.S. ----, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996); *Fuller v. City of Oakland,* 47 F.3d 1522, 1527 (9th Cir.1995) ("Whether the workplace is objectively hostile must be determined from the perspective of a reasonable person with the same fundamental characteristics."); *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995) (inquiring whether "the discrimination would have detrimentally affected a reasonable person of the same protected class in that position"); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1454 (7th Cir.1994) ("We thus consider not only the actual effect of the harasser's conduct on his victim, but also the effect similar conduct would have had on a reasonable person in the plaintiff's position."). *But see Gillming v. Simmons Indus.,* 91 F.3d 1168, 1172 (8th Cir.1996) (though court had previously adopted "reasonable woman" standard, "[g]iven the Supreme Court's use of the "reasonable person' standard [in *Harris* ], we cannot find that the district court abused its discretion in using that standard in its jury instruction"); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2d Cir.1995) (applying reasonable person standard); *Amirmokri v. Baltimore Gas & Elec. Co.,* 60 F.3d 1126, 1131 (4th Cir.1995) (same); *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) (same); *DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594 (5th Cir.) ("The test is an objective one, *not* a standard of offense to a "reasonable woman.' "), *cert. denied,* --- U.S. ----, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995); *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 444 (7th Cir.1994) (applying reasonable person standard).

AFFIRMED.