Rhonda Lynn SMITH, et al., Plaintiffs,

v.

AUBURN UNIVERSITY, et al., Defendants.

No. CIV.A. 00–D–1561–E.

United States District Court, M.D. Alabama, Eastern Division.

March 18, 2002.

Michael Stephen Harper, Harper & Smith, PC, Tallassee, for Rhonda Lynn Smith, Clinton A. Smith, plaintiffs.

David R. Boyd, Balch & Bingham, Montgomery, Leslie McCafferty Allen, Monica G. Graveline, Balch & Bingham, Birmingham, Lee F. Armstrong, Auburn University, for Auburn University, Barry A. Robertson, individually and in his official capacity as an employee of Defendant Auburn University, Harvey O. Dahl, individually and in his official capacity as an employee of Defendant Auburn University, defendants.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is a Motion For Summary Judgment which, along with a supporting brief, was filed on February 11, 2002 by Defendants Auburn University, Barry A. Robertson ("Robertson"), and Harvey O. Dahl ("Dahl") (collectively "Defendants"). (Doc. Nos.18–19.) Plaintiffs Rhonda Lynn Smith and Clinton A. Smith ("Plaintiffs") filed a Brief in Opposition on February 27 (Doc. No. 23), to which Defendants filed a timely Reply on March 6. (Doc. No. 25.) After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion is due to be granted in part and denied in part.

### I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over the present matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367. The parties do not contest personal jurisdiction or venue.

### II. SUMMARY JUDGMENT STANDARD

When a party moves for summary judgment, the court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

This determination involves applying substantive law to the pertinent facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. *See id.* at 248, 106 S.Ct. 2505; *Barfield v. Brier-*

*ton,* 883 F.2d 923, 933 (11th Cir.1989). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If this task is satisfied, the burden then shifts to the non-moving party, which must designate specific facts remaining for trial and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Judgment will be granted when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *See id.* at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND

Plaintiff Rhonda Lynn Smith was, at all times relevant to the present cause of action, employed as a clerk in the Auburn University Printing Services department. (R.L. Smith Dep. at 25.) Shortly after her tenure began, Smith found herself subjected to the wiles of a co-worker named John Andrews. (*Id.*) Andrews developed a habit of sharing unsolicited hugs with Smith, a situation toward which Smith felt sufficient discomfort so as to prompt her to notify her supervisor, Barry Robertson. (*Id.*) Robertson tried to assuage her concerns by suggesting that, as a preacher, Andrews was not prone to lascivious tendencies. (*Id.* at 25–26.) However, as the embraces persisted, Robertson succumbed to Smith's complaints and assured her that he would speak with Andrews. (*Id.* at 26–27.)

There is nothing in the record describing the substance of any subsequent conversations between Robertson and Andrews, but an indication of the deterrent effect thereof is exemplified by the events that followed. While Andrews may have been a preacher, he made some comments to Smith unbecoming of a man of the cloth. For example, he recommended that she divorce her husband and marry him, and he shared his fantasy of kidnaping her. (*Id.* at 64–65.) Andrews also regularly expressed his opinion of Smith's beauty, once remarking that she was "as smooth as carnation milk." (*Id.*) Andrews' unseemly behavior was common knowledge within the Printing Service department. (Lockhart Dep. at 8–15; Roberts Dep. at 24–27; Barnes Dep. at 19–21; Gates Dep. at 10–14; Hill Dep. at 18–20.) On September 3, 1997, Andrews' suggestive comments were accompanied with physical contact; he rubbed his hand up and down Smith's posterior while expressing his bemusement as to the pleasure he took in touching her in such a manner. (R.L. Smith Dep. at 33–38.) Smith again went to Robertson and demanded that her situation be remedied. (*Id.*)

Although Auburn University's harassment policy requires supervisors in such circumstances to "promptly notify the University's Equal Employment Opportunity Officer," Robertson did not do so, perhaps because he had been given no training as to handling sexual harassment complaints. (Def.'s Ex. 8; Robertson Dep. at 23–26.) Rather, Robertson referred the matter to Harv Dahl, the Director of Printing Services, who in turn contacted the personnel department. (Robertson Dep. at 83, 87–88.) Thereafter, Robertson advised Smith to record the incident in writing, and she promptly complied. (R.L. Smith Dep. at 38, 40.) He then met with Andrews and told him that another similar incident would not be tolerated; a written record of the conversation observed that more action would be taken if necessary. (Def.'s Ex. 5; Robertson Dep. at 88–93.) Robertson contends he was acting at the behest of the personnel department, but its officer insists that it would have been unorthodox to relegate such responsibility to a supervisor since Auburn University has established elaborate procedures to handle these very

incidents. (Robertson Dep. at 88–89; Pl.'s Ex. 1 at 214.) Nonetheless, said officer has no recollection of the specific information conveyed to Robertson. (Pl.'s Ex. 1 at 214.)

Regardless, the threat of termination evidently struck a chord with Andrews for, immediately thereafter, he discontinued his offensive conduct toward Smith. (Smith Dep. at 24–25.) The record is unclear as to the overall nature of Andrews' interactions with Smith over the course of the following fifteen months. Although Smith kept an extensive journal as to the incidents surrounding the present lawsuit, the only entry in this period concerned Andrews' cold disposition in the weeks following the touching incident.[1] (Smith Dep. Ex. 3.) The next recorded event of a sexual nature occurred in December of 1998 when it came to Smith's attention that Andrews had been making comments to co-workers attesting to his desire for her. (Smith Dep. Ex. 7.) Therein Smith observes that she again reported the situation to Robertson, who in turn warned Andrews to be careful about his behavior toward Smith. (Id.) It was Andrews' contention that the source of such rumors was untrustworthy and was driven merely by jealousy of his friendship with Smith. (Id.) Indeed, Andrews had attempted to make amends with Smith, "a long spell" after the 1997 incident. (Smith Dep. at 25, 48–49.) Although they shook hands on this conciliatory occasion, shortly thereafter the hugs began again. (Id.) While the relapse in physical conduct was not recorded in Smith's journal, in her deposition she testified that she told Andrews that he could lose his job over this unwanted touching, and she complained to Robertson to no avail. (Id.) When Robertson was unresponsive, Smith approached Dahl who

insisted that Robertson was her sole source of redress. (Id. at 88–89.)

The final straw occurred on January 11, 1999. (Id. at 50.) Smith accompanied Andrews to the storage room for what she believed to be a work-related matter. (Id.) No one else was present. (Id.) When Smith expressed her impatience with Andrews' request due to how cold it was, Andrews responded by rubbing his hands across her breasts remarking, "that ought to warm you up." (Id.) Smith has testified that she was demoralized by the experience and that she was shaking in tears when she went to report the incident to Robertson. (Id. at 53–56.) This time when Robertson conferred with Dahl, they decided to refer the matter to Auburn University's Equal Employment Opportunity ("EEO") Office. (Robertson Dep. at 110–13.) ,

An EEO Officer was sent to investigate the matter the following day, and Andrews was terminated shortly thereafter. (Armstrong–Wright Dep. at 145, 217.) At no time during the course of the investigation were Smith and Andrews ever at work at the same time. (Id. at 149–50, 157.) In sifting through the various allegations, the EEO Officer learned that another complaint had previously been lodged against Andrews by another female, yet Robertson had not acted on it. (Id. at 154.) Indeed, Andrews' personnel file contained a record only of the final incident in 1999. Nonetheless, the EEO Officer came to the conclusion that, while Robertson's management style was ineffectual, he was in no way driven by gender animosity. (Id. at 203–04, 221–22.) Employees within the Printing Services department have testified as to Robertson's unresponsiveness regarding employee complaints, and have also re-

---

1. When Smith brought this to Robertson's attention, he recommended working out some sort of resolution with Andrews since they were destined to work together for a long time. (R.L. Smith Dep. at 46.)

marked on his propensity to tell tasteless and demeaning jokes. (Roberts Dep. at 20; Strong Dep. at 35–36; Gates Dep. at 36–39.) Indeed, recognizing that workplace morale suffered due to Robertson's demeanor, the EEO Officer recommended that Dahl implement certain steps to improve employee confidence. (Armstrong–Wright Dep. at 222.) Neither Dahl nor Robertson is presently employed by the Auburn University Printing Services department. (Robertson Dep. at 17.)

## IV. DISCUSSION

On the basis of the foregoing events, Rhonda Lynn Smith filed the present lawsuit against Auburn University, Robertson and Dahl. She has generally alleged sex discrimination in violation of Title VII and of the Equal Protection Clause, but the facts are consistent with the parties having argued only as to the viability of Smith's hostile work environment claim.[2] (Compl.¶¶ 24–26.) She has likewise filed claims of negligence and wantonness under the common law of Alabama. (Id. at 27–28.) Smith seeks compensatory and punitive damages to the extent available under the law, while her husband Clinton has joined the lawsuit with a loss of consortium claim on the basis of the residual effects of the distress his wife suffered at the hands of Andrews. (*Id.* at 22.) The court will address each legal theory separately.

### A. *Smith's Title VII Claim*

■ Sexual harassment is a form of gender discrimination prohibited under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2(a)(1); *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (holding that hostile work environment sexual harassment is actionable claim under Title VII). Smith can prevail on her hostile work environment claim by establishing that she suffered harassment that was sufficiently severe or pervasive such that the conditions of her employment were altered. *Burlington Indus. v. Ellerth,* 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The court initially notes, that, although the Complaint generally alleges a Title VII violation on the part of all Defendants, only Smith's employer, Auburn University, may be sued under this cause of action. *See Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991) ("Individual capacity suits under Title VII are ... inappropriate."). Accordingly, the Title VII claims against Dahl and Robertson are due to be dismissed. Before the court addresses the scope of Auburn University's liability, however, it must first determine which instances of alleged harassment it can consider in its analysis.

### 1. *Continuing Violation Doctrine*

■ Title VII permits a plaintiff to seek recourse in a federal court only if she first files a charge of discrimination with the EEOC within 180 days after the allegedly discriminatory act occurred. 42 U.S.C. § 2000e–5(e). A plaintiff is procedurally barred from seeking a remedy with respect to acts which occurred more than 180 days prior to filing a charge. *See Lewis v. Bd. of Trustees of Alabama State Univ.,* 874 F.Supp. 1299, 1303 (M.D.Ala. 1995). There is an exception to this rule, however. Where the discriminatory acts constitute a "continuing violation," a plaintiff may bring a suit on the basis of these acts so long as the "last occurrence of an instance of that practice" occurred within the 180–day window. *Beavers v. Am. Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th

---

**2.** Although the Complaint alleged facts supporting a claim of hostile work environment as well as one of retaliation under Title VII, Plaintiffs have conceded that summary judgment is appropriate on the retaliation claim. (Opp'n at 35.)

Cir.1992). Under this theory Smith requests that the court consider all her distasteful experiences in the course of determining the extent of Auburn University's liability.

■ While a "hostile work environment claim is the quintessential continuing violation," mere allegation thereof does not satisfy the requirements of the continuing violation doctrine. *Geer v. Marco Warehousing, Inc.,* 179 F.Supp.2d 1332, 1337 (M.D.Ala.2001). Rather, the court applies a fact-intensive three-factor test to determine whether the alleged discriminatory acts constitute a continuing violation:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* (internal quotations omitted). The focus in such circumstances, then, is on what event "should have alerted the average lay person to act" to ensure that her rights were protected. *Messer v. Meno,* 130 F.3d 130, 135 (5th Cir.1997) (citations omitted); *Jensen v. Frank,* 912 F.2d 517, 522 (1st Cir.1990) ("What matters is whether, when and to what extent the plaintiff was on inquiry notice.").

■ Undoubtedly, the breast-rubbing incident in January 1999 was so significant that it prompted Smith to demand that action be taken against her aggressor. This event is the only instance on record to have occurred within the 180–day period, so in order for it to serve as an "anchor" for the earlier events there must be some nexus between the allegations. *Geer,* 179 F.Supp.2d at 1338. Equitable considerations require that the nexus be such that the events are "linked by 'similarity, repetition, and continuity.' " *Id.* at 1339 (quoting *Provencher v. CVS Pharmacy,* 145 F.3d 5, 15 (1st Cir.1998)). The parties do not contest the similarity of the actions to which Smith was subjected; they all involve unwanted comments and touchings from the same individual. Rather, Auburn University argues that the "long spell" between the September 1997 touching incident and the reprise of Andrews' misconduct constitutes a break in the continuity such that "the acts were in no way recurring, but were more in the nature of isolated instances." *Id.* at 1338.

The present difficulty facing the court lies in the hazy time line it must divine from the evidence. Smith does not provide a demarcation, offering only non-specific deposition testimony that the hugging and comments resumed a "long spell" after the 1997 incident. While no mathematical formula can instruct the court as to the sufficient lapse in time needed before otherwise continuous activity is treated as discrete in nature, the court can safely conclude that the sixteen-month break as characterized by Auburn University would not call for application of the continuing violation doctrine. *Cf. id.* at 1339 ("The continuing violation doctrine does not exist to provide a 'second chance' to an employee who allowed a legitimate claim to lapse."). In this vein, Auburn University points out that, while Smith kept voluminous notes as to the facts surrounding the present lawsuit, there is a notable absence during this time span. Only two events were recorded during these sixteen months: the first refers to

Smith complaining to Robertson about Andrews' negative attitude shortly after the 1997 incident, and the second documents her complaining to Robertson about some suggestive comments Andrews had allegedly made about her to his co-workers. It might be logical to suspect that if Smith was recording these events, she would have been compelled to make a note of complaints she lodged pertaining to the hugging. On the other hand, she was under no obligation to do as much, so the court should not penalize her for overlooking such events. Indeed, the ongoing hugging evidently was not so overbearing that Robertson felt compelled to address it.

In this light it is important to point out the role played by permanence, "perhaps the most important factor" in the continuing violation analysis. *Malone v. K–Mart Corp.*, 51 F.Supp.2d 1287, 1301 (M.D.Ala. 1999). Permanence is a function of whether an employee should have known she should assert her rights. *Id.* Even a "reasonably prudent" employee is not likely to conclude that repeated hugging is of the type of activity to trigger his or her rights under Title VII. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001). The continuing violation doctrine focuses on the idea that it is unfair to impose a burden on a prospective plaintiff to file a cause of action when the nature of the ongoing conduct is, without more, insufficient to create a strong case of harassment. Rather, in these milder instances employees should be encouraged to seek their employer's assistance in putting an end to the conduct before it worsens. The record indicates that Smith attempted to do just that; the court should not disregard the prior events simply because her supervisor failed to address her pleas.

The court has previously observed that it "is the cumulative effect of a discriminatory practice rather than any discrete occurrences which give rise to the application of the continuing violation doctrine." *Geer*, 179 F.Supp.2d at 1337. While the court cannot determine how long Andrews' behavior toward Smith subsided, the response to Smith's complaints never changed. She was told the situation would be remedied, yet Andrews continued to thwart her wishes to be treated with dignity. The court does not believe it should harshly limit the application of the continuing violation doctrine simply because a helpless employee mistakenly trusted that her employer would alleviate her situation. Given the ongoing pattern of which Smith's supervisors were aware, the court concludes that the "long spell" was not significant enough to prevent the court from considering the events of 1997.

### 2. The Substance of Smith's Hostile Work Environment Claim

In order to state a claim for hostile work environment, Smith must show that: (1) she is a member of a protected group; (2) she has been subjected to unwanted harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there is a basis for holding her employer liable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999); *Ellerth*, 524 U.S. at 753–54, 118 S.Ct. 2257. The first three factors are not in issue.[3] Accordingly the following discussion focuses on whether Smith suffered severe or pervasive harassment, and, if so, whether there is a basis for holding Auburn University liable.

**3.** Auburn University points to some evidence suggesting that Smith occasionally acted in a flirtatious manner toward Andrews, but it cannot seriously contend that the overall tenor of the relationship between the two individuals was rife with "unwelcome" conduct.

The severe or pervasive analysis has a subjective as well as an objective component. *Mendoza*, 195 F.3d at 1246. The filing of the present lawsuit is telling as to her perceptions, but a determination of the reasonableness thereof is a much more "fact-intensive" endeavor. *Id.* This examination is to be guided by a consideration of the totality of the circumstances in light of the following factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is threatening or humiliating as opposed to merely offensive; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* Furthermore, the conduct should be viewed in the overall context rather than as isolated acts, unless, of course, the context makes clear that the acts were, in fact, isolated instances. *Id.* The normative goal of gender equity in the workplace is curtailed so long as a female is distracted from her duties by being placed in a situation where she repeatedly is resisting the advances of an aggressive associate. Indeed, courts have recognized a cause of action under the hostile work environment theory specifically in order "to protect working women from the kind of male attention that can make the workplace hellish for women." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995). Circumstances constituting a hostile work environment have included "sexual assaults [and] other physical contact, whether amorous or hostile, for which there was no consent express or implied." *Id.* It may well be that the occasional hug is not so severe as to satisfy the "baseline" line established in *Mendoza* for surviving summary judgment. *Mendoza*, 195 F.3d at 1244 (observing that judges "police the baseline" when they address hostile work environment claims at the summary judgment stage). But when the hugging is repeated and the victim thereof has made constant resistive efforts, such a conclusion may not be so readily drawn. When viewed in the context of his flirtatious and often threatening comments, there can be no doubt that Andrews' conduct was more than that of a friendly preacher. Moreover, groping bordering on sexual assault is not the type of conduct that a woman should be expected to endure in the workplace. Andrews' conduct was ongoing and offensive; it so distracted Smith from her work that she was brought to tears. Accordingly, the court is satisfied that Smith has raised a genuine issue of material fact as to whether she was subjected to severe and pervasive harassment of such a degree so as to alter the terms and conditions of her workplace.[4]

Of course, however much the terms and conditions of Smith's employment may have been altered, Title VII is solely concerned with intentional discrimination by an employer. Since Smith was subjected to harassment by a co-worker, she may subject Auburn University to liability only by showing that it "knew or

---

4. Auburn University has attempted to downplay the significance of Smith's work environment by distinguishing hugs from unwanted touching. (Mot. at 29.) While the hugs may not have been as significant as the other physical contact which Smith endured, the false dichotomy diminishes the gravity of the overall context. Every case relied upon in Auburn University's brief involving unwanted touching concerns milder touching in a less severe context. *See Shepherd v. Comptroller of Pub. Accts. of Tex.*, 168 F.3d 871, 872 (5th Cir. 1999) (rubbing an arm); *Adusumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir.1998) (four touchings of arm, fingers, and buttocks); *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993) (tapping a shoulder). While the *Mendoza* court recognized these instances not to meet its baseline, it was not so dismissive of cases involving the type of conduct at issue presently. *See Mendoza*, 195 F.3d at 1249–51 n. 8 (providing exhaustive lists of cases where summary judgment was not granted on the basis of groping).

should have known of the harassment in question and failed to take prompt remedial action." *Splunge v. Shoney's Inc.*, 97 F.3d 488, 490 (11th Cir.1996) (quoting *Steele v. Offshore Shipbuilding*, 867 F.2d 1311, 1316 (11th Cir.1989)). There is no question that Auburn University appropriately responded to the 1999 incident, given that Andrews was terminated after an investigation was conducted. Smith argues, however, that the 1999 incident could have been avoided altogether had Auburn University heeded her prior complaints. Auburn University does not contest that it either knew or should have known of the problems Smith was encountering with Andrews. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988) (holding that an employer is deemed aware of harassment when employee "complained to higher management of the problem"). It insists, however, that prompt remedial action was taken. The court disagrees.

Smith draws much attention to the fact that, while Auburn University had an established procedure for responding to allegations of harassment, Dahl and Robertson did not adhere to this mechanism when Smith provided them a written complaint in 1997. This failure alone does not constitute prima facie evidence that the remedial response was insufficient. While it is possible that matters might have been different had they done as much, there is no evidence in support of this speculation. The EEO Officer who investigated the 1999 incident resolutely refused to opine as to whether the circumstances in 1997 called for termination given the nuances that she would have needed to investigate at the time. (Armstrong–Wright Dep. at 133–34.) What is known, however, is that within twenty-four hours Robertson threatened Andrews with termination should another event arise. Thereafter, misconduct ceased for "a long spell." A threat of termination has been deemed

prompt remedial action by the Eleventh Circuit. *Huddleston*, 845 F.2d at 904. Moreover, insofar as the appropriate standard is whether the remedial action is "reasonably likely to prevent the misconduct from recurring," a strong case can be made that the "long spell" is proof of the effectiveness of the responsive action. *Kilgore v. Thompson & Brock Mgmt.*, 93 F.3d 752, 754 (11th Cir.1996) (internal quotations omitted); *see also Robinson v. Jacksonville Shipyards*, 760 F.Supp. 1486, 1531 (M.D.Fla.1991) (observing that in the Eleventh Circuit, "an employer can defend successfully by showing that the conduct brought to the company's attention was not repeated after the employer took action").

On the other hand, the ineluctable fact remains: after an undefined intermission, Andrews continued to harass Smith. In this light, perhaps the court cannot be so hasty in concluding that the threat of termination was a sufficient remedy. This hesitation is further compelled by the recognition that Smith lodged further complaints with Robertson, yet the threat of termination proved to ring hollow. *Cf. Intlekofer v. Turnage*, 973 F.2d 773, 779–80 (9th Cir.1992) (holding that more severe disciplinary mechanisms are needed when harassment continues). Indeed, Smith has testified that after the "long spell" had subsided, she spoke with both Robertson and Dahl as to her ongoing troubles with Andrews, yet insufficient steps were taken so as to prevent the incident in January of 1999. In this light it is worth noting that, beyond speaking with Andrews, nothing in the record suggests that Robertson further investigated the scope of the problem. The court believes that these facts, when viewed in the light most favorable to Smith, raise a genuine issue of material fact as to whether appropriate remedial action was taken in response to Andrews' harassment. Accordingly, summary judg-

ment is due to be denied on Smith's hostile work environment claim against Auburn University.

## B. Smith's Equal Protection Claim

 The Eleventh Circuit has recognized that Title VII's hostile work environment theory is equally applicable to equal protection claims brought pursuant to 42 U.S.C. § 1983. *See, e.g., Watkins v. Bowden,* 105 F.3d 1344, 1355 (11th Cir. 1997). Smith has conceded that summary judgment is appropriate against Auburn University as well as Robertson and Dahl in their official capacities due to sovereign immunity under the Eleventh Amendment.[5] (Opp'n at 35.) Smith continues to press her claim against Dahl and Robertson in their individual capacities, however. A prima facie case of hostile work environment pursuant to Section 1983 is established in a manner similar to one under Title VII, except that Smith also must show that Robertson and Dahl were acting under color of state law. *Watkins,* 105 F.3d at 1355. While the Title VII discussion readily comports with the present analysis, the court's conclusion differs in one respect: summary judgment is appro-

priate because Dahl and Robertson are entitled to qualified immunity.[6]

 As supervisors responding to employee complaints, Robertson and Dahl undoubtedly were acting in their discretionary capacities.[7] In such circumstances, state officials may be found liable only when their actions violate clearly established "rights of which a reasonable person would have known." *Edwards v. Wallace Community College,* 49 F.3d 1517, 1523 (11th Cir.1995) (internal quotations omitted). In other words, it must have been apparent to a reasonable person that Dahl and Robertson were clearly violating the law when they failed to adequately prevent Andrews from harassing Smith in the future. While Smith has presented the court with Eleventh Circuit opinions demonstrating that the failure to respond entirely would have been inappropriate, she has presented no cases suggesting that the threat of termination is an inadequate remedy. Certainly, the facts indicate that the threats were not followed through when Robertson learned that the hugging had continued, but it cannot definitively be said that a lesser degree of physical con-

---

5. Although the Eleventh Amendment precludes an award of money damages against the state and its officials in § 1983 actions, it does not preclude injunctive relief. *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also Rigby v. Auburn Univ.,* 448 So.2d 345 (Ala.1984) (holding that Auburn University is an instrumentality of the State of Alabama). However, not only does Smith concede that summary judgment should be granted, the complaint indicates that she never sought prospective injunctive relief under this claim. Accordingly, this aspect of the claim is due to be dismissed.

6. Even though the crux of the § 1983 claim centers on alleged malfeasances which took place more than two years prior to the filing of the present action, the court does not believe the claim is barred by the relevant statute of limitations, namely Alabama's limita-

tion on tort actions. *Dukes v. Smitherman,* 32 F.3d 535, 537 (11th Cir.1994) (observing that Alabama's statute of limitations for torts applies to Section 1983 actions in federal courts sitting in Alabama). Alabama follows the general rule that a cause of action accrues when the injury takes place, not when the alleged wrongdoing occurred. *City of Mobile v. Jackson,* 474 So.2d 644, 649 (Ala.1985).

7. The argument that the mandatory language of the harassment policy removed discretion from Dahl and Robertson is not well-taken. As discussed above, the failure to abide by Auburn University's sexual harassment policy is not determinative of liability; the only question is whether the remedial action was appropriate. The supervision and general discipline of subordinates is a discretionary function within Dahl and Robertson's ambit. (Armstrong–Wright Dep. at 76–77.)

tact required outright termination under Eleventh Circuit law, especially when that contact took place some time after the initial threat. In short, however much the blame for Smith's anguish can be attributed to Dahl and Robertson, it is not so much that the law plainly dictated that they act in a different manner. Accordingly, summary judgment is due to be granted as to the entirety of Smith's equal protection claim.

### C. Smith's State Law Claims

Smith's claims of negligence and wantonness likewise must fail. First of all, Auburn University is entitled to absolute immunity under Article I, § 14 of the Constitution of Alabama 1901. Moreover, Alabama law clearly establishes that a "State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based on the agent's exercising his or her judgment in ... hiring, firing, transferring, assigning, or supervising personnel." *Ex parte Cranman*, 792 So.2d 392, 405 (Ala.2000). As discussed in the context of the § 1983 claim, Auburn University's sexual harassment policy does not limit the discretionary authority of Dahl and Robertson such that the disciplinary actions taken with regard to Andrews in any way exceeded their authority. Accordingly, summary judgment is due to be granted on Plaintiffs' state law claims.[8]

### V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby GRANTED IN PART and DENIED IN PART as follows:

(1) summary judgment be and the same is hereby GRANTED as to all claims against Defendant Auburn University except for the hostile work environment claim brought pursuant to Title VII;

(2) summary judgment be and the same is hereby GRANTED as to all claims against Defendants Barry Robertson and Harvey Dahl. There being no remaining claims against these Defendants, it is CONSIDERED and ORDERED that said Defendants be and the same are hereby DISMISSED as parties to the present action;

(3) there being no more claims for which Plaintiff Clinton Smith is eligible for loss of consortium damages, it is CONSIDERED and ORDERED that said Plaintiff be and the same is hereby DISMISSED as a party to the present action.

---

8. No more state law claims remain against either Dahl or Robertson, and no claims from which Clinton Smith is eligible for loss of consortium damages remains. *See Godby v.*

*Electrolux Corp.*, 65 F.E.P. 211 (N.D.Ga.1994) (observing that loss of consortium claims are unavailable in Title VII actions). As such, said parties are due to be dismissed.