**ORDERED** that the trial court's award of costs and attorney's fees is **VACATED.**

Karen **SHEAFFER**, Plaintiff,

v.

**COUNTY OF CHATHAM**, Linda Clarke, Personally and in Her Official capacity as Chatham County Library Services Director, Defendants.

No. 1:03 CV 0057.

United States District Court, M.D. North Carolina.

Sept. 17, 2004.

Jeffrey L. Starkweather, Pittsboro, NC, for plaintiff.

Donna R. Rascoe, Ann Smith Estridge, Cranfill Sumner & Hartzog Raleigh, NC, for defendants.

## MEMORANDUM OPINION AND ORDER

OSTEEN, District Judge.

Plaintiff Karen Sheaffer brought this action against the County of Chatham, North Carolina, and its Library Services Di-

rector, Linda Clarke, asserting various claims related to her termination as librarian for the Goldston branch of the Chatham County Library. In particular, Plaintiff asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, the North Carolina Persons With Disabilities Protection Act, N.C. Gen.Stat. § 168A–1 *et seq.*, the North Carolina Constitution, as well as state common law claims for intentional infliction of emotional distress and negligent infliction of emotional distress. This matter is now before the court on Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated herein, Defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

The following facts are presented in the light most favorable to Plaintiff. *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994).

Plaintiff began working for Defendant Chatham County ("the County") in its Goldston Public Library in January 1987 and by that spring had become the Goldston branch's manager. Upon her hiring as manager, Plaintiff was elected as a board member of the Goldston Friends of the Library (the "Friends"), a private, non-profit corporation whose purposes included raising funds for the library, providing volunteers, and advocating for the interests of the library.

In December 2000, Defendant Linda Clarke was hired as Library Services Director. In January 2001, Plaintiff met with Clarke and Assistant County Manager Paul Spruill for Plaintiff's annual performance review. Plaintiff received evaluations of "Above Standard" in all categories as well as overall. Shortly af-

ter this meeting, according to Plaintiff, Clarke's attitude toward Plaintiff began to deteriorate. This change began when Plaintiff suggested that the branch librarians at the County's two other libraries assume children's programming duties with Plaintiff's guidance. Plaintiff indicated that her increasing demands as Goldston branch manager prohibited her from continuing to conduct children's programming throughout the county. In response to this proposal, Clarke suggested eliminating the part-time employee position at the Goldston Library and having that person take over all children's programming duties. Plaintiff responded that the loss of her part-time employee would lead to reduced hours of operation at the Goldston branch.

In June 2001, Plaintiff met with Clarke and regional library director Margaret Blanchard. During a discussion of the Goldston branch's hours, Blanchard expressed anger about a similar dispute that had occurred in 1996. Also during the meeting, Plaintiff proposed reinstituting a popular "reading dollar" program for children that rewarded children with "reading dollars" they could redeem for prizes at the library. The program had ended in 1997. According to Plaintiff, Blanchard was "visibly angry" at Plaintiff for raising these concerns. (Am.Compl.¶ 25.) After this meeting, Clarke began what Plaintiff calls a "relentless campaign of harassment, intimidation, and retaliation" for the exercise of her free speech rights. (*Id.* ¶ 26.)

On June 21, 2001, Clarke imposed a "Performance Plan" on Plaintiff though no complaints about Plaintiff's job performance had been brought to Plaintiff's attention. Among other things, the plan required Plaintiff to communicate with all staff members, including Clarke, "in a manner that is constructive and positive." (*Id.* ¶ 27.) Plaintiff's discussions with

Clarke were not to "involve comparisons with the other libraries unless so deemed appropriate by [Clarke]." (*Id.*) Plaintiff was also instructed to "attend meetings of the Goldston Friends of the Library along with [Clarke]." (*Id.*) Pursuant to the County's personnel ordinance, Plaintiff filed a grievance against Clarke for the imposition of this plan. Plaintiff's grievance was denied and although Plaintiff did not believe her concerns had been adequately addressed, she was unable to appeal the decision under the personnel ordinance.

On August 27, 2001, Clarke gave Plaintiff a written warning for violating the plan by attending a Friends meeting on August 21, 2001. Apparently Clarke read the requirement that Plaintiff "attend meetings of the Goldston Friends of the Library along with [Clarke]" to mean that Plaintiff could not attend Friends meetings without Clarke. With Clarke's permission, Plaintiff prepared a statement to submit to the Friends board indicating that she was not to attend Friends meetings without Clarke. Friends President Vance Dunn learned of the rule imposed by Clarke and scheduled a discussion of it at the September Friends meeting. Clarke was present at that meeting but according to Plaintiff refused to provide an explanation for the treatment of Plaintiff.

The day after the September Friends meeting, Clarke gave Plaintiff a second written warning, this time for conspiring with at least one Friends member to have the rule discussed at the Friends meeting rather than through internal processes. The warning specifically instructed Plaintiff that the appropriate remedy for her concerns was to file a grievance, although Plaintiff believed that county policy prohibited her from filing a grievance to challenge a written warning. Plaintiff's attorney filed a grievance directly with County Manager Charlie Horne, who declined to intervene.

During the same period, Plaintiff alleges that Clarke increasingly harassed her regarding her sick leave requests and medical needs, including regularly leaving harassing and threatening messages for Plaintiff while she was out on sick leave. On October 18, 2001, Plaintiff's attorney wrote to County Human Resources Manager Carolyn Chandre and requested four to six weeks of medical leave under the FMLA and ADA due to Plaintiff's anxiety and depression. Plaintiff alleges that even while she was out on leave, Clarke continued her pattern of harassment.

Also on October 18, Clarke issued a third written warning to Plaintiff for her alleged failure to carry out assigned tasks while on sick leave. On November 1, Clarke notified Plaintiff that a disciplinary conference had been scheduled for November 20 to discuss Plaintiff's alleged performance deficiencies. County Manager Horne held the conference in Plaintiff's absence despite Plaintiff's requests to delay the meeting until her health improved. Horne recommended that Plaintiff be terminated effective December 5, 2001.

Under the County's personnel policy, Plaintiff had a right to appeal the decision to the Personnel Advisory Committee, which had the effect of staying her termination. Plaintiff's appeal hearing was scheduled for January 31, 2002, and was later rescheduled to February 12, 2002. Plaintiff requested to be allowed the assistance of counsel or another support person at the hearing due to her health problems, but that request was denied. Plaintiff read a statement at the meeting but left shortly thereafter. Plaintiff was unable to present witnesses or cross-examine the County's witnesses. At the conclusion of the hearing, the committee recommended upholding Plaintiff's termination. On Feb-

ruary 18, 2002, Plaintiff received a letter from Horne formally terminating her.

Plaintiff filed this case in state court. Defendants removed the action to this court, and, subsequently, Defendants moved to dismiss all of Plaintiff's claims.

## II. STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of pleadings, but do not seek to resolve disputes surrounding the facts, the merits of claims, or the applicability of any defenses. *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). A court should dismiss a case for failure to state a claim upon which relief can be granted "only in very limited circumstances." *Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324, 325 (4th Cir. 1989). When considering a motion to dismiss, the court must evaluate the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. *Randall v. United States,* 30 F.3d 518, 522 (4th Cir.1994). Dismissal should not be granted "unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs. Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). Nevertheless, although "plaintiff is not charged with pleading facts sufficient to prove her case, as an evidentiary matter, in her complaint, a plaintiff *is* required to allege facts that support a claim for relief." *Bass v. E.I. Dupont De Nemours & Co.,* 324 F.3d 761, 765 (4th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 301, 157 L.Ed.2d 253 (2003); *see also Cockerham ex rel. Cockerham v. Stokes County Bd. of Educ.,* 302 F.Supp.2d 490, 496 (M.D.N.C.2004).

## III. DISCUSSION

### A. Section 1983 Claims

██ Plaintiff has asserted claims under 42 U.S.C. § 1983, alleging that Defen-

dants, acting under color of state law, deprived her of rights secured by the Constitution and laws of the United States. Specifically, Plaintiff alleges that she was deprived of her rights under the First and Fourteenth Amendments to the Constitution and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff seeks compensatory and punitive damages for these violations.

██ Defendants first argue that some of the actions Plaintiff complains of are time barred. Because § 1983 does not have its own statute of limitations, courts borrow the time limitation from the analogous state statute of limitations. *National Adver. Co. v. City of Raleigh,* 947 F.2d 1158, 1161 (4th Cir.1991). The applicable statute in North Carolina is N.C. Gen.Stat. § 1–52(5), which provides a three-year limitation on personal injury actions. *Id.* at 1162 & n. 2. Even though the limitations period is borrowed from state law, however, the calculation of when the cause of action accrued is a matter of federal law. *Id.* at 1162. Under federal law, the cause of action accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.,* 64 F.3d 951, 955 (4th Cir.1995) (citing *United States v. Kubrick,* 444 U.S. 111, 122–24, 100 S.Ct. 352, 359–60, 62 L.Ed.2d 259 (1979)).

In her complaint, Plaintiff mentions several disputes that she and other Friends members had with two of Plaintiff's superiors regarding various aspects of library management including hours of operation, the inter-library reserve policy, and the children's summer reading program. (Am. Compl.¶¶ 13–16.) In March 1997, Plaintiff received a lower-than-expected performance evaluation from Barbara Garcia, then the Chatham County Library Services Director. (*Id.* ¶ 17.) On June 23, 1997,

Plaintiff filed a grievance against Garcia, alleging that this lowered evaluation was in retaliation for Plaintiff's exercise of her "public employee free speech and assembly rights." (*Id.* ¶ 18.) Because Plaintiff was aware of her alleged injury and raised complaint at the time, it seems clear that Plaintiff's cause of action as related to these events accrued by June 23, 1997, at the latest. Plaintiff commenced this action on April 16, 2003,[1] and so any claim that accrued prior to April 16, 2000, is time barred. As such, any claims Plaintiff is attempting to raise that accrued before April 16, 2000, will be dismissed.

### 1. First Amendment Claims

Plaintiff's first § 1983 claim is that Defendants retaliated against her for exercising her rights under the First Amendment. It is settled that "[t]he government may not retaliate against a public employee who exercises her First Amendment right to speak out on a matter of public concern." *Love–Lane v. Martin*, 355 F.3d 766, 776 (4th Cir.2004) (citing *Pickering v. Board of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968)). A three-step analysis is employed to determine whether a retaliatory action violates a public employee's right to free speech. First, the speech must relate to a matter of public concern. *Id.* Second, the "employee's interest in First Amendment expression must outweigh the employer's interest in efficient operation of the workplace." *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 352 (4th Cir.2000). Finally, there must be a causal connection between the protected speech and the retaliation; specifically, the protected speech must be a "substantial factor" in the decision to take the retaliatory action. *Love–Lane*, 355 F.3d at 776 (quoting *Goldstein*, 218 F.3d at 352).

The Fourth Circuit has held that "[s]peech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Urofsky v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir.2000) (en banc). Because the court must determine whether a matter is of public, rather than private, concern "[t]he focus is therefore upon whether the 'public' or the 'community' is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a 'private' matter between employer and employee." *Berger v. Battaglia*, 779 F.2d 992, 999 (4th Cir.1985). Similarly critical is ascertaining whether the speech was made primarily in the plaintiff's role as employee or primarily in her role as citizen. *Urofsky*, 216 F.3d at 407. To make this determination, the court must review the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

In her complaint, Plaintiff has noted several discussions between herself and Clarke that she alleges were the basis for the retaliation against her. In April 2001, Plaintiff suggested to Clarke that children's programming at each of the three libraries in Chatham County be conducted by each branch librarian with Plaintiff's assistance. Clarke responded by proposing instead that a part-time employee of the Goldston branch instead take over Plaintiff's children's programming duties. (Am.Compl.¶ 24.) In June 2001, Plaintiff attended a meeting with Clarke and regional library director Blanchard, which

---

**1.** The precise date of Plaintiff's commencement of this action will be explored in further detail below. *See infra* § III.B.

included discussions of the hours of operation for the Goldston branch as well as the possibility of reinstating the reading dollar incentive program for children, a program Blanchard had previously opposed. (*Id.* ¶ 25.)

■ Plaintiff also alleges that her past administrative filings were a basis for retaliation. For example, Plaintiff filed a grievance against Clarke for the June 21 performance plan Clarke imposed on Plaintiff. In her grievance, Plaintiff specifically criticized what she characterized as Clarke's violation of her "first amendment rights to speak up for the needs of Goldston library and its patrons." (*Id.* ¶ 28.) Plaintiff also demanded the right to make a written response to any proposed administrative or programmatic changes that she thought would adversely affect the programming or operation of Goldston library.[2] (*Id.*)

The issues raised by Plaintiff need not involve the substantial political or social issues that rise to the level of "public concern" in many cases. *See, e.g., Love–Lane,* 355 F.3d at 776 (holding that racial discrimination in public schools constitutes a matter of public concern); *Goldstein,* 218 F.3d at 355 (finding concerns about the failure to follow safety protocols in a firefighting company to be "a matter of the highest public concern"); *see also Jurgensen v. Fairfax County,* 745 F.2d 868, 879

(4th Cir.1984) (suggesting that speech may be of "limited public interest" when it does not "seek to bring to light actual or potential wrongdoing or breach of public trust"). Nonetheless, whether a public employee's speech is "interesting or important" is not the court's concern. *Urofsky,* 216 F.3d at 407. What must be ascertained is "whether the 'public' or the 'community' is likely to be truly concerned with" the subject matter. *Berger,* 779 F.2d at 999.

■ Although this analysis presents a question of law, *Love–Lane,* 355 F.3d at 776, it is nonetheless a fact-specific inquiry, *Holland v. Rimmer,* 25 F.3d 1251, 1255 (4th Cir.1994). Some of the concerns raised by Plaintiff involve matters of internal governance, such as which employee would be responsible for children's programming and the appropriate utilization of one of the Goldston library's part-time employees. Such internal disputes do not constitute matters of public concern. *See Connick,* 461 U.S. at 149, 103 S.Ct. at 1691 ("[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."). Other concerns raised by Plaintiff, such as the library's hours of operation and the children's reading reward program, may be of greater concern to the public. Indeed, Plaintiff alleges that she was bringing the concerns of library patrons to the attention of Clarke and Blanchard.[3] (*See* Am. Compl. ¶ 25.)

---

**2.** Plaintiff also views as retaliatory Clarke's directive that Plaintiff not attend Friends meetings unless Clarke was also present. (Am. Compl. ¶ 32.) This assertion implicates not only Plaintiff's right to free speech, but also her freedom of association. Whatever limitations a government employer may place on its employees' right to associate are "closely analogous" to the limitations that may be placed on their right to speak. *Edwards v. City of Goldsboro,* 178 F.3d 231, 249 (4th Cir.1999) (quoting *Wilton v. Mayor & City Council,* 772 F.2d 88, 91 (4th Cir.1985)). As such, the court applies the same consider-

ations to Plaintiff's freedom of association allegations as to her free speech allegations. *See id.*

**3.** The exact nature of Plaintiff's role on the Friends board remains unclear. Plaintiff has alleged that, "[u]pon her hiring as the Goldston branch manager, the Plaintiff was elected as a Board Member of the [Friends]," and that her role on the board was "to provide the Friends with information concerning changes in the administration and/or program offerings of the library system, answer questions, and be a conduit in present-

The court cannot conclude as a matter of law that there exists no set of facts upon which Plaintiff could show that some of her speech involved a matter of public concern.

■■■ The Court likewise cannot conclude at this time that Defendant's interests in a properly functioning operation outweigh Plaintiff's interests in the contested expression. On the basis of Plaintiff's complaint alone, the court cannot ascertain the extent to which Plaintiff's speech might have impaired discipline by her superiors, had a detrimental effect on working relationships within the library system, or impeded the performance of Plaintiff's duties. *See Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987). Without additional information, the court cannot conclude that the second factor of the analysis weighs so strongly in Defendants' favor to warrant dismissal of Plaintiff's claim. Defendants' motion to dismiss Plaintiff's § 1983 claim based on the First Amendment will therefore be denied.

### 2. Other Section 1983 Claims

Plaintiff raises three additional § 1983 claims. First, Plaintiff claims that the alleged retaliation for exercise of her free speech rights violates not only her First Amendment rights, but her right to equal protection of the laws under the Fourteenth Amendment. (*See* Am. Compl. ¶ 61.) Second, she asserts an independent claim under § 1983 for discrimination on the basis of disability, also in violation of

the Fourteenth Amendment. Plaintiff also raises a § 1983 claim asserting violation of her rights under Title VII.

Plaintiff's purported equal protection claim based on her free speech rights "is best characterized as a mere rewording of [her] First Amendment retaliation claim," because it does not add anything beyond that claim. *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir.1999). Even though Plaintiff's § 1983 claim based on free speech retaliation will not be dismissed, the same facts do not make out an equal protection claim. *Id.* ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause.") (quoting *Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir.1997)). As such, Plaintiff's free speech retaliation claim, to the extent it is based on the Equal Protection Clause, will be dismissed.

■■■ Plaintiff's second equal protection claim is based on disability discrimination. In *Zombro v. Baltimore City Police Department*, the Fourth Circuit held that a plaintiff alleging age discrimination could not bring a § 1983 action for violation of the Equal Protection Clause because doing so would allow the plaintiff to bypass the comprehensive remedies created by the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* 868 F.2d 1364, 1366–68 (4th Cir.1989). *Zombro* bars an age discrimination plaintiff from bringing a § 1983 action to assert violations of the substantive rights created

---

ing the Friends' concerns and requests to the attention of her administrative supervisors." (Am.Compl.¶ 12.) Defendants describe Plaintiff's position as being a representative of the library system to the Friends and assert that she participated in Friends meetings as a county employee. (Defs.' Reply Br. at 2, 4.) Plaintiff, on the other hand; argues that her participation at Friends meetings was "as a citizen" and representing the interests of the library patrons. (Pl.'s Resp.

Opp'n Mot. Dismiss at 18.) In considering Defendants' motion under Rule 12(b)(6), the court must accept as true the allegations in Plaintiff's complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir.1994). Paragraph 12 of the amended complaint does not plainly support either party's interpretation of Plaintiff's role on the Friends board, and, as such, the court cannot at this stage draw any conclusions from the parties' assertions on this point.

by the ADEA or a § 1983 action asserting constitutional claims of age discrimination. *See id.* at 1368–69; *Causey v. Balog,* 929 F.Supp. 900, 912 (D.Md.1996), *aff'd,* 162 F.3d 795 (4th Cir.1998). Similarly, plaintiffs cannot use § 1983 to bring claims regarding violations of their rights under Title VII. *Hughes v. Bedsole,* 48 F.3d 1376, 1383 n. 6 (4th Cir.1995); *Causey,* 929 F.Supp. at 913 (citing *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204 (6th Cir.1984)). For this reason, Plaintiff's § 1983 claim based on Title VII must fail.[4]

■ Plaintiff's § 1983 claim for disability discrimination, though stated under the Equal Protection Clause, is essentially a claim of discrimination under the ADA. The ADA adopts Title VII's detailed procedural system for relief. *See* 42 U.S.C. § 12117(a) (adopting the administrative procedures of Title VII). For the same reasons that a plaintiff cannot bypass the procedural requirements of Title VII or the ADEA by bringing a § 1983 claim, this court concludes that Plaintiff cannot bypass the remedial scheme established by Congress in the ADA to raise an equal protection claim for disability discrimination. *See Alsbrook v. City of Maumelle,* 184 F.3d 999, 1011 (8th Cir.1999); *Walker v. City of Salisbury,* 170 F.Supp.2d 541, 548 (D.Md.2001). For this reason, Plaintiff's § 1983 claim for violation of the Equal Protection Clause on the basis of disability discrimination will be dismissed.

3. Clarke's Liability

■ Plaintiff has made her claims against Clarke both in Clarke's individual capacity and in her official capacity as Library Services Director. As to the claims against Clarke in her official capacity, these claims are essentially duplicative of her claims against the County. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985) (noting that such suits are "to be treated as a suit against the entity" and that any recovery comes from the entity, not the person sued). Because official capacity suits are essentially suits against the entity itself, they may be dismissed, where, as here, the government entity is sued. *See Love–Lane v. Martin,* 355 F.3d 766, 783 (4th Cir.2004); *Disher v. Weaver,* 308 F.Supp.2d 614, 628 (M.D.N.C.2004); *Hicks ex rel. Hicks v. Halifax County Bd. of Educ.,* 93 F.Supp.2d 649, 667 (E.D.N.C. 1999). For this reason, Plaintiff's § 1983 claims against Clarke in her official capacity will be dismissed.

■ Defendants also assert that Clarke is protected from individual liability on Plaintiff's First Amendment claim by the doctrine of qualified immunity. The Fourth Circuit has held that "the purpose of qualified immunity is to remove most civil liability actions, except those where the official clearly broke the law, from the legal process well in advance of the submission of facts to a jury." *Slattery v. Rizzo,* 939 F.2d 213, 216 (4th Cir.1991). Public officials are not expected to resolve subtle constitutional questions, as they "are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *McVey v. Stacy,* 157 F.3d 271, 277 (4th Cir.1998) (quoting *Maciariello v. Sumner,* 973 F.2d 295, 298 (4th Cir. 1992)). Importantly, a ruling on the issue of qualified immunity "should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).

---

4. The court also notes that nothing in Plaintiff's complaint indicates that she was discriminated against on the basis of her "race, color, religion, sex, or national origin" as required to state a claim under Title VII. *See, e.g.,* 42 U.S.C. § 2000e–2(a)(1).

An inquiry into qualified immunity involves a two-step analysis. First, the court must decide whether, in the light most favorable to Plaintiff, the facts alleged demonstrate that Clarke violated any of Plaintiff's constitutional rights. *See id.* at 201, 121 S.Ct. at 2156. Second, the court must consider whether the right was "clearly established" at the time of the events at issue. *Id.; accord Mansoor v. Trank,* 319 F.3d 133, 137 (4th Cir.2003).

As discussed above, it is not clear at this point whether Plaintiff can show that her constitutional rights have been violated. For the purposes of considering Clarke's qualified immunity defense, however, the court will assume that Plaintiff has made a sufficient showing on the first step of the analysis. *See Pike v. Osborne,* 301 F.3d 182, 185 (4th Cir.2002).

▮ The second step in the qualified immunity analysis requires the court to determine whether the right alleged to have been violated was "clearly established." This step requires an objective inquiry into whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Owens ex rel. Owens v. Lott,* 372 F.3d 267, 279 (4th Cir.2004) (alterations in original) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). For a right to be "clearly established" there need not be precedent holding the same conduct unlawful, but the conduct's unlawfulness must be apparent from pre-existing law. *Id.* In the context of First Amendment retaliation cases, the Fourth Circuit has recognized that "only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined." *DiMeglio v. Haines,* 45 F.3d

790, 806 (4th Cir.1995); *accord Pike,* 301 F.3d at 185. Even though the "particularized balancing" is "difficult to apply," the Fourth Circuit has not held that "a public employee's right to speak on matter of public concern could *never* be clearly established." *Cromer v. Brown,* 88 F.3d 1315, 1326 (4th Cir.1996); *accord Mansoor,* 319 F.3d at 139.

▮ Plaintiff analogizes this case to *Mansoor.* There, a police officer had been placed on administrative leave but was permitted to return to work under the following condition:

> That [plaintiff] shall at all times refrain from any verbal or written communications to third parties, including but not limited to county employees, relating to [plaintiff's] employment that are in any way critical or negative towards the county executive, the chief of police or other police department management or command staff, or any other county official or employee.

*Mansoor,* 319 F.3d at 136. In bringing his lawsuit, Mansoor alleged that the restriction served as a prior restraint on his First Amendment rights as well as retaliation for his past complaints. *Id.* The district court granted summary judgment for the county and the police department, but denied summary judgment for the individual defendants, finding that their acts were not protected by qualified immunity. *Id.* The Fourth Circuit affirmed, holding that the broadly-worded restriction violated the plaintiff's First Amendment rights and that the defendants could not have reasonably believed the plaintiff's rights were not violated. *See id.* at 138–39.

Plaintiff asserts that Clarke's actions, particularly her directive that Plaintiff not attend Friends meetings unless Clarke accompanied her, violated Plaintiff's rights in the same manner as in *Mansoor.* The restriction in this case, however, is differ-

ent from that in *Mansoor.* The restriction in *Mansoor* barred any speech "in any way critical or negative towards" county officials, including Mansoor's supervisors. *Id.* at 136. The restriction in this case only prevented Plaintiff from attending a Friends meeting without Clarke. (*See* Am. Compl. ¶ 32.) Furthermore, it is not at all clear that the speech that would be impacted by such a ban would be speech on matters of public concern. Finally, unlike the blanket ban in *Mansoor,* which can be read to govern speech both during and outside of the workday, in this case Friends meetings occurred during Plaintiff's working hours at the time Clarke imposed her restriction. (*See* Am. Compl. Ex. C ¶ 4, (noting that Friends meetings were moved to 5:15 P.M. in October 2001 so that they would be after Plaintiff's working hours).) It does not seem unreasonable for an employer to conclude that she could restrict an employee's attendance at meetings of a group during working hours, especially when it is difficult to determine whether the group will be discussing matters of public concern. Given the difficult test that Clarke would have had to apply to these facts, the court cannot conclude that Plaintiff's First Amendment rights in this instance were "clearly established." As such, Clarke has qualified immunity to Plaintiff's § 1983 claims, and those claims will be dismissed.

### 4. Punitive Damages

 Plaintiff also seeks punitive damages for her § 1983 claims. Since Plaintiff's claims against Clarke have already been dismissed, her only remaining § 1983 claims are against the County. The Supreme Court has expressly held, however, that municipalities are immune from punitive damages under § 1983. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981). Because punitive damages are not available against a municipality, Plaintiff's claim for punitive damages under § 1983 will be dismissed.

### B. Americans with Disabilities Act Claims

 Plaintiff asserts two ADA claims. Plaintiff first asserts discrimination in violation of 42 U.S.C. § 12112. Plaintiff also asserts a claim for retaliation under 42 U.S.C. § 12203(a). Prior to bringing either type of claim in federal court, a plaintiff must exhaust her administrative remedies by bringing her claim before the Equal Employment Opportunity Commission ("EEOC"). *Sloop v. Memorial Mission Hosp., Inc.,* 198 F.3d 147, 148 (4th Cir.1999). The ADA adopts the procedures of Title VII of the Civil Rights Act of 1964 governing administrative review by the EEOC. 42 U.S.C. § 12117(a). Thus a plaintiff must file her EEOC charge within 180 days of the unlawful employment practice complained of. 42 U.S.C. § 2000e–5(e)(1). When a plaintiff fails to comply with the 180–day filing requirement, the claim is time barred and must be dismissed. *McCullough v. Branch Banking & Trust Co.,* 35 F.3d 127, 131 (4th Cir. 1994).

 In this case, Plaintiff filed her charge with the EEOC on August 12, 2002, claiming that the discrimination against her had occurred from October 3, 2001 to February 13, 2002, the date of her official termination. (*See* Am. Compl. Ex. A.) The EEOC dismissed the complaint as untimely filed. (*See id.* Ex. B.) This court, however, is not bound by the EEOC's determination as to timeliness. *See Weise v. Syracuse Univ.,* 522 F.2d 397, 413 (2d Cir.1975). Counting in accordance with Federal Rule of Civil Procedure 6(a) from February 13, 2002 (the last date of discrimination indicated on the charge), Plaintiff's charge was due on August 12, 2002, the date on which it was apparently

received. (*See* Am. Compl. ¶ 8.) The charge thus appears to have been timely filed with the EEOC, at least in part. The question remaining is which claims are validly covered by the charge.

Plaintiff contends that all of the conduct described in the charge is timely because it all relates to a single continuing violation. In *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court clarified the applicability of the "continuing violation" doctrine to the 180–day filing rule. The Court held that every discrete act of discrimination or retaliation "constitutes a separate actionable 'unlawful employment practice'" that "starts a new clock for filing charges alleging that act." *Id.* at 113–14, 122 S.Ct. at 2072–73. Even when time-barred discriminatory acts are related to the acts contained in timely-filed charges, the time-barred acts are not actionable in federal court. *See id.* at 113, 122 S.Ct. at 2072; *Mosley v. Bojangles' Rests. Inc.*, No. 1:03CV50, 2004 WL 727033, at *5 (M.D.N.C. Mar.30, 2004). An exception to this rule exists for hostile work environment claims, which are "composed of a series of separate acts that collectively constitute only one 'unlawful employment practice.'" *National R.R.*, 536 U.S. at 117, 122 S.Ct. at 2074. As long as at least one component act of the hostile work environment falls within the statutory time period, the entire time period of the hostile work environment, including apparently untimely acts, can be considered. *See id.*

Here, at least one discrete act occurred within the 180–day deadline: Plaintiff's official firing on February 12, 2002. The firing, as a discrete act, is actionable. Acts that occurred prior to February 12, 2002, are not actionable as discrete acts. *See Mosley*, 2004 WL 727033, at *5. Nonetheless, because at least one act of harassment occurred within the filing period, the

past acts may be considered as part of a hostile work environment claim. *See National R.R.*, 536 U.S. at 117, 122 S.Ct. at 2074; *Mosley*, 2004 WL 727033, at *5.

Civil actions under the ADA must also be filed within 90 days of receiving a right-to-sue letter from the EEOC. 42 U.S.C. § 2000e–5(f)(1). Plaintiff received her right-to-sue letter from the EEOC "[o]n or about January 20, 2003." (Am.Compl.¶ 9.) Taking January 20, 2003, as the starting date, Plaintiff was required to file her complaint by April 21, 2003, for her action to be timely. Plaintiff in fact filed her complaint in state court on May 6, 2003. Nevertheless, Plaintiff maintains that the filing was timely because she took advantage of Rule 3 of the North Carolina Rules of Civil Procedure ("Rule 3") which allows a civil action to be commenced by the issuance of a summons (rather than the filing of a complaint, *cf.* Fed.R.Civ.P. 3) when "(1) A person makes application to the court stating the nature and purpose of his action and requesting permission to file his complaint within 20 days and (2) the court makes an order stating the nature and purpose of the action and granting the requested permission." N.C. Gen.Stat. § 1A–1, Rule 3. Plaintiff made a request under this rule on April 16, 2003, and summonses were issued that day. Plaintiff's case thus began on April 16, 2003, provided she filed her complaint by May 6, 2003. Since Plaintiff met that deadline, her ADA claims were timely filed.

Defendants maintain that Plaintiff's ADA claims are still untimely, contending that Rule 3 cannot be used to extend a federal statute of limitations. Defendants cite *Cannon v. Kroger Co.*, in which the Fourth Circuit held that the Rule 3 procedure could not be used to extend the six-month statute of limitations for so-called "hybrid" § 301/fair representation claims under the National Labor Relations Act.

832 F.2d 303, 305–06 (4th Cir.1987). Defendants seek to extend this rule to contexts beyond the "hybrid" claims that *Cannon* discusses. The reasoning of *Cannon*, however, makes clear that the rationale for barring the operation of Rule 3 was motivated by a desire for uniformity in "hybrid" cases that had been expressed by the Supreme Court. *See id.* at 305 (noting that while the Supreme Court had not expressly held that "a plaintiff in a 'hybrid' action is required to commence an action by filing a complaint in accordance with Fed.R.Civ.P. 3 in order to toll the limitation period," its "announced goal of uniformity would be severely undercut, however, if alternative means of computing elapsed time were available") (citing *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 171–72, 103 S.Ct. 2281, 2294, 76 L.Ed.2d 476 (1983)). In an analogous case, a district court held that Rule 3 would not be allowed to extend a federal statute of limitations in a case in which the United States had partially waived its sovereign immunity.[5] *See Henderson Fruit & Produce Co. v. United States*, 181 F.Supp.2d 566, 568 (E.D.N.C.2001).

■■■ *Cannon* and *Henderson* suggest that the operation of Rule 3 should only be barred when there are strong federal interests that favor a strictly construed federal statute of limitations. Here, there are no similar circumstances. The Supreme Court has not mandated a single, uniform statute of limitations as in *Cannon*,[6] and the narrow construction of sovereign im-

munity does not apply as in *Henderson.* Moreover, Defendants cite no cases where the Fourth Circuit or any other court has extended the rule in *Cannon* to the ADA or any related statutes. This court thus concludes that the Rule 3 procedure can properly be used in North Carolina state courts to extend the time in which to file claims under the ADA. Because Plaintiff sought the extension of time, had summonses issued before the 90–day period expired, and filed her complaint within the 20–day extension, her ADA claims were timely filed.

Defendants have raised no other grounds by which the court should dismiss Plaintiff's ADA claims against the County. As such, Defendants' motion to dismiss these claims against the County will be denied.

■■■ Defendants next argue that Clarke cannot be held liable under the ADA. The ADA permits actions against an "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 2000e–5(b). The definition of the term "employer" is the same under both the ADA and Title VII. *Compare* 42 U.S.C. § 12111(5)(A) *with* 42 U.S.C. § 2000e(b). For that reason, the Fourth Circuit extended to the ADA its holding that individual supervisors who do not meet the statutory definition of "employer" are not liable under Title VII. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir.1999) (citing *Lissau v. South-*

---

**5.** On the other hand, one decision from this court did not immediately reject allowing Rule 3 to extend the statute of limitations for bringing a § 1983 claim. *See Spencer v. Town of Chapel Hill*, 290 F.Supp.2d 655, 660 (M.D.N.C.2003). In *Spencer*, the court dismissed the plaintiff's action not because Rule 3 could not extend the federal statute of limitations, but because the plaintiff had not properly followed the requirements of Rule 3

by having a summons issued within the limitation period. *See id.*

**6.** Indeed, under other sections of the ADA, as well as the Rehabilitation Act, courts apply state statutes of limitations. *See, e.g., Gaona v. Town & Country Credit*, 324 F.3d 1050, 1055–56 (8th Cir.2003); *Everett v. Cobb Cty. Sch. Dist.*, 138 F.3d 1407, 1409–10 (11th Cir. 1998); *Wolsky v. Medical Coll. of Hampton Roads*, 1 F.3d 222, 223–25 (4th Cir.1993).

*ern Food Serv., Inc.*, 159 F.3d 177, 180–81 (4th Cir.1998)); *accord Mason v. Stallings,* 82 F.3d 1007, 1009 (11th Cir.1996); *Equal Employment Opportunity Comm'n v. AIC Sec. Investigations Ltd.,* 55 F.3d 1276, 1279–82 (7th Cir.1995). Plaintiff has proffered no argument suggesting that Clarke qualifies as an employer under the ADA. Rather, it is apparent that Clarke was a supervisor, while Chatham County was Plaintiff's employer. As such, Defendant's motion to dismiss Plaintiff's ADA claims against Clarke will be granted.

### C. Family and Medical Leave Act Claims

The FMLA protects the right of eligible employees to take up to 12 weeks of unpaid leave because of a serious health condition, to care for the serious health condition of an immediate family member, or to care for a newly-born or newly-adopted child. *See* 29 U.S.C. § 2612(a)(1). A person who avails herself of such leave is entitled to be restored to her position or an equivalent position at the end of the leave without the loss of any benefits that had accrued prior to taking the leave. *Id.* § 2614(a)(1)-(2). In her complaint, Plaintiff alleges that she was retaliated against for exercising these rights. (*See, e.g.,* Am. Compl. ¶¶ 44, 47.)

The FMLA protects an employee from this type of retaliation or discrimination for exercising her FMLA rights.[7] *See* 29 U.S.C. § 2615(a)(1)-(2); 29 C.F.R. § 825.220(c); *Klaiber v. Rinaldi,* No. 1:99CV541, 2001 WL 823529, at *3 (M.D.N.C. June 20, 2001). The Fourth Circuit has suggested in dicta that the Title VII *McDonnell–Douglas* test for retaliation is applicable to FMLA retaliation cases. *See Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 301 (4th Cir.1998). Accordingly, this court has applied a three-pronged test to such claims. To succeed, a plaintiff is required to prove "(1) that he or she engaged in FMLA-protected activity; (2) that the employer took an adverse employment action against the plaintiff; and (3) that there is a causal connection between the plaintiff's protected activity and

---

7. The FMLA also provides a cause of action for a denial of the substantive rights of leave and reinstatement, *see* 29 U.S.C. § 2617(a), but Plaintiff appears to concede that she has not stated such a claim. (*See* Pl.'s Br. Opp'n Mot. Dismiss at 26.) Based on Plaintiff's allegations, it appears that Plaintiff did receive FMLA leave beginning on October 18, 2001. (*See* Am. Compl. ¶ 39.) Thus, if Plaintiff has stated a claim under this category of FMLA protections, it must be for failure to reinstate. Although the FMLA provides that an employer must reinstate an eligible employee following FMLA leave, regulations under the FMLA provide that "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA." 29 C.F.R. § 825.214(b). Courts have thus held that a plaintiff does not state a cause of action for failure to reinstate when he is unable to return to work at the end of the 12–week period. *See Sarno v. Douglas Elliman–*

*Gibbons & Ives, Inc.,* 183 F.3d 155, 161 (2d Cir.1999); *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.,* 155 F.3d 775, 784–85 (6th Cir.1998). Defendants maintain that Plaintiff's complaint in fact demonstrates that she could not fulfill her job requirements. For example, Plaintiff alleges that the "severe mental impairments (major depressive disorder and anxiety and panic disorders)" would hinder her participation in a termination appeal hearing scheduled for February 12, 2002 (after the 12–week leave period had expired). (Am.Compl.¶ 50.) At the hearing, Plaintiff read a statement that indicated that she was under the influence of "heavy prescription drugs" and that she was not "physically or emotionally able to answer any questions from the committee" or otherwise participate in the hearing. (*Id.* Ex. D.) Defendants also point out that Plaintiff alleges that the same mental conditions continued to exist at least through the filing of the complaint. (*See id.* ¶ 54.) Given these conditions, it seems highly unlikely that Plaintiff was able to return to her job when the 12–week period ended.

the employer's adverse employment action." *Klaiber*, 2001 WL 823529, at \*4 (quoting *Findlay v. PHE, Inc.*, No. 1:98CV1068, 1999 WL 1939245, at \*3 (M.D.N.C. Apr.16, 1999)). Plaintiff has alleged sufficient facts to state a claim for retaliation under the FMLA. Plaintiff has alleged that she engaged in FMLA-protected activity by requesting (and apparently receiving) a leave of absence. (*See* Am. Compl. ¶ 39.) Plaintiff's firing constituted an adverse employment action. *See Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir.2001) (" '[U]ltimate employment decisions'—to hire, discharge, refuse to promote, etc.—can constitute the necessary adverse employment action."). Moreover, it is possible that the harassment Plaintiff alleges rose to the level of an adverse employment action. *Id.* Lastly, Plaintiff has alleged that the harassment and termination were caused, at least in part, by the exercise of her FMLA rights. (*See* Am. Compl. ¶¶ 26, 44, 47.) Plaintiff has alleged all of the elements of a claim of retaliation under the FMLA, and this is not a case in which it appears certain that Plaintiff can prove no set of facts which would support her claim and would entitle her to relief. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993). For this reason, dismissal of this claim is inappropriate.

Defendants also argue that Clarke cannot be held liable for any FMLA violation. The FMLA provides that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of" rights under the FMLA. 29 U.S.C. § 2615(a)(1). The FMLA defines "employer" as follows:

The term "employer" -

(i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;

(ii) includes -

(I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and

(II) any successor in interest of an employer;

(iii) includes any "public agency," as defined in section 203(x) of this title; and

(iv) includes the General Accounting Office and the Library of Congress.

*Id.* § 2611(4)(A).[8]

Subsection (4)(A)(ii)(I) appears on first glance to attach liability to individuals, at least to the extent they "act[ ], directly or indirectly, in the interest of an employer to any of the employees of such employer." A majority of courts have concluded that public employees can be held liable under the FMLA. *See, e.g., Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir.2002); *Cantley v. Simmons*, 179 F.Supp.2d 654, 656–57 (S.D.W.Va.2002) (noting that "[t]he majority of courts that have examined the FMLA's statutory language have concluded that a plain reading indicates that public employees may be considered 'employers' under the FMLA"); *Carter v. United States Postal Serv.*, 157 F.Supp.2d 726, 728 (W.D.Ky.2001) (concluding that "common logic and standard rules of grammar" mandate that public officials be suable as individuals); *Morrow v. Putnam*, 142

---

8. Under 29 U.S.C. § 203(x), a "public agency" is defined as "the Government of the United States; the government of a State or political subdivision thereof; any agency of the United States (including the United States Postal Service and Postal Rate Commission), a State, or a political subdivision of a State; or any interstate governmental agency." There is no dispute that the County is a political subdivision of the state and thus a public agency for purposes of the FMLA.

F.Supp.2d 1271, 1276 (D.Nev.2001); *Kilvitis v. County of Luzerne,* 52 F.Supp.2d 403, 412 (M.D.Pa.1999) ("[T]he plain language of the FMLA evinces an intent to provide for individual liability."). Nonetheless, some courts have held that public officials cannot be sued as employers under the FMLA. *See, e.g., Mitchell v. Chapman,* 343 F.3d 811, 832 (6th Cir.2003) (concluding, based on a textual analysis, that public employees cannot be held individually liable under the FMLA), *cert. denied,* —— U.S. ——, 124 S.Ct. 2908, —— L.Ed.2d —— (2004); *Wascura v. Carver,* 169 F.3d 683, 686 (11th Cir.1999) (applying Fair Labor Standards Act jurisprudence to conclude that no claim under the FMLA could be maintained against public officials); *Keene v. Rinaldi,* 127 F.Supp.2d 770, 778–79 (M.D.N.C.2000) (concluding that public officials may not be sued as employers under the FMLA).

▮▮▮▮▮ Any resolution of the meaning of a statute must begin with the text of the statute itself. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). The plain meaning of the text controls, except where a literal reading of the text would compel an odd result or one demonstrably at odds with legislative intent. *Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989); *Ron Pair,* 489 U.S. at 242, 109 S.Ct. at 1031. Subsection (4)(A)(iii) includes public agencies within the term "employer." When subsection (4)(A)(ii)(I) refers to "any person who acts, directly or indirectly, in the interest of an employer," there is no reason to suppose that employees of those public agencies, acting in the agencies' interest, would be excluded from the definition. *See Morrow,* 142 F.Supp.2d at 1272–73. Thus, subsection (4)(A)(ii)(I) can be read as including "any person who acts, directly or indirectly, in the interest of an employer, including a public agency." This reading of the statute is also consistent with the physical construction of the text. The em dash after the word "employer" suggests that all four subparagraphs of paragraph (4)(A) modify the word employer, so that employer "'means' what is provided for in subparagraph (i) and 'includes' what is provided for in subparagraphs (ii), (iii), and (iv)." *Id.* at 1273; *accord Cantley,* 179 F.Supp.2d at 657. *But cf. Mitchell,* 343 F.3d at 830 (noting the lack of punctuation indicating an inter-relationship between subparagraphs (ii), (iii), and (iv), and concluding that they instead should be treated independently); *Keene,* 127 F.Supp.2d at 776 (noting that had subparagraph (ii) been intended to apply to the whole paragraph, it could have been listed at the end, and suggesting that subpart (ii)(II), referring to successors in interest, does not apply to public agencies). Ultimately, this court agrees with the reasoning of *Morrow* and *Cantley.* The simplest reading of the statutory text compels the conclusion that public employees who act, directly or indirectly, in the interest of the public agency for which they work, may be held individually liable under the FMLA.[9] Discovery

---

**9.** Courts addressing this question also frequently look to the Fair Labor Standards Act ("FLSA") because of the similarity of the definitions of the term "employer" in the two acts. *See, e.g., Wascura v. Carver,* 169 F.3d 683, 686–87 (11th Cir.1999); *Cantley v. Simmons,* 179 F.Supp.2d 654, 657–58 (S.D.W.Va. 2002) (collecting cases). The court declines to undertake such an analysis for two reasons. First, the Fourth Circuit has only in dicta stated that an individual could be liable for FLSA violations when he acts in the interest of a private employer. *See Brock v. Hamad,* 867 F.2d 804, 808 n. 6 (4th Cir.1989) ("Even if the businesses were within a corporate structure, [the individual defendant] would still be the employer who would be liable for violations of the FLSA."). Second, despite the similarity between the FLSA and FMLA, Congress may not have intended that the two be construed in the same manner since it

may reveal that Clarke did not exercise the requisite level of authority[10] over Plaintiff's employment to be considered an employer under the FMLA. However, the court cannot say that Clarke's position as an official of a public agency compels dismissal as a matter of law. *See Morrow,* 142 F.Supp.2d at 1276. For this reason, Defendant's motion to dismiss Plaintiff's FMLA claim against Clarke in her individual capacity will be denied.

Defendants lastly contend that Plaintiff's request for damages far exceeds the scope of potential FMLA damages. Plaintiff seeks compensatory and liquidated damages for "increased medical expenses, loss of income (back and front pay), future insurance coverage, other employment benefits, and employment advancement opportunities, future employment opportunities, emotional, mental, and physical pain, suffering, and distress." (Am.Compl.¶ 94.)

 The FMLA only provides for recovery of wages, salary, or employment benefits lost by reason of a violation of the FMLA, plus interest, and some amount of liquidated damages. 29 U.S.C. § 2617(a)(1)(A)(i). Plaintiff cannot recover damages for emotional distress or punitive damages. *Keene,* 127 F.Supp.2d at 772–73 & n. 1; *Settle v. S.W. Rodgers, Co.,* 998 F.Supp. 657, 666 (E.D.Va.1998), *aff'd,* 182 F.3d 909, 1999 WL 486643 (4th Cir.1999).

Similarly, Plaintiff cannot recover for anxiety or physical injury sustained as a result of an FMLA violation. *Dawson v. Leewood Nursing Home, Inc.,* 14 F.Supp.2d 828, 833 (E.D.Va.1998). To the extent Plaintiff's claims for damages exceed the permissible scope of the FMLA, they will be dismissed.

### D. State Constitutional Claims

 Plaintiff asserts several claims of violations of the North Carolina Constitution. Under North Carolina law, a plaintiff may bring a direct claim under the state constitution if no other adequate remedy exists. *Corum v. University of N.C.,* 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). Plaintiff's primary claims are for retaliation for exercise of her rights under Sections 12 and 14 of Article I of the North Carolina Constitution. Section 12 protects freedom of assembly,[11] while Section 14 protects freedom of speech and press.[12] These are precisely the kinds of direct claims under the state constitution that *Corum* recognized. *Id.* (calling an action by an employee against the state for free speech retaliation "essential to the preservation of free speech"). The standards for free speech retaliation claims under the state constitution are the same as those for free speech claims under the federal constitution. *Harter v. Vernon,*

---

clearly separated private employers and public agency employers in the FMLA but did not do so in the FLSA. *See Keene v. Rinaldi,* 127 F.Supp.2d 770, 775 n. 2 (M.D.N.C.2000).

**10.** The Fourth Circuit has not clearly identified what level of authority a supervisor must have to qualify as an employer. *See Buser v. Southern Food Serv., Inc.,* 73 F.Supp.2d 556, 564 (M.D.N.C.1999). In *Brock,* the court held that an individual "clearly was the employer" because "it [was] not disputed that he hired and directed the employees who worked for the enterprise." *Brock,* 867 F.2d at 808 n. 6. It is clear from the allegations in this case that Clarke had some management responsi-

bilities. Resolving the question of whether her authority was sufficient under the statute will require additional evidence.

**11.** Section 12 provides, in part, that "[t]he people have a right to assemble together to consult for their common good." N.C. Const. Art. I, § 12.

**12.** Section 14 provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse." N.C. Const. Art. I, § 14.

953 F.Supp. 685, 697 (M.D.N.C.), *aff'd,* 101 F.3d 334 (4th Cir.1996); *see Evans v. Cowan,* 132 N.C.App. 1, 9, 510 S.E.2d 170, 175–76 (1999) (applying *Connick* standard); *Lenzer v. Flaherty,* 106 N.C.App. 496, 515, 418 S.E.2d 276, 287–88 (1992) (evaluating Section 14 claim under First Amendment standard). *But cf. Evans v. Cowan,* 122 N.C.App. 181, 183–84, 468 S.E.2d 575, 577–78 (noting that provisions in the state constitution are not always interpreted in the same manner as their analogs in the federal constitution, and that summary judgment on federal constitutional claims does not bar state constitutional claims by the operation of res judicata), *aff'd,* 345 N.C. 177, 477 S.E.2d 926 (1996). Thus, for the same reason that Plaintiff's First Amendment retaliation claim will not be dismissed, Plaintiff's claims under Sections 12 and 14 of Article I of the North Carolina Constitution will not be dismissed.

 Plaintiff also asserts claims under Sections 1 and 19 of Article I of the North Carolina Constitution.[13] Section 1 provides that "We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. Art. I, § 1. The basic principle underlying this section is "the right of the individual to be free to enjoy the faculties with which he has been endowed by his Creator, to live and work where he will, to earn his livelihood by any lawful calling, and to pursue any legitimate business, trade or vocation." *State v. Warren,* 252 N.C. 690, 693, 114 S.E.2d 660, 663 (1960). This provision has thus been held to protect the right to engage in "ordinary trades and occupations" without undue government regulation or interference. *Id.* at 693, 114 S.E.2d at 664; *accord North Carolina Real Estate Licensing Bd. v. Aikens,* 31 N.C.App. 8, 12, 228 S.E.2d 493, 496 (1976). Section 1 does not, however, create an interest in a particular job that would give rise to a constitutional claim, because employment contracts in North Carolina are generally terminable at will. *See Peele v. Provident Mut. Life Ins. Co.,* 90 N.C.App. 447, 451, 368 S.E.2d 892, 894–95 (1988). Plaintiff's claim under Section 1 will, therefore, be dismissed.

 Plaintiff's claim under Section 19 comprises two distinct areas of law: equal protection and due process. Plaintiff's equal protection claim would likely be based on disability discrimination. As noted above, however, claims under the North Carolina Constitution are available only in the absence of another adequate remedy. *Corum,* 330 N.C. at 782, 413 S.E.2d at 289. In this instance, the North Carolina Persons With Disabilities Protection Act provides an adequate remedy for Plaintiff's disability discrimination claims. *See* N.C. Gen.Stat. § 168A–11 (creating a cause of action for persons aggrieved by discrimi-

**13.** It is clear from Count 3 of Plaintiff's amended complaint that her claims under Sections 1 and 19 are not the primary claims she is asserting. Count 3 is titled "State Constitutional Violation—Free Speech Retaliation," a type of claim that would seem to implicate Sections 12 and 14. Moreover, although Sections 1 and 19 are cited twice, Plaintiff never asserts how her equal protection, due process, or other rights have been violated. On the other hand, Plaintiff specifically alleges that she was terminated "in retaliation for her exercise of her state constitutional free speech and assembly rights." (Am.Compl.¶ 66.) Most telling, perhaps, is that despite receiving permission to file an extended brief in opposition to Defendants' motion to dismiss, Plaintiff therein makes absolutely no mention of her claims under Sections 1 and 19. Since Plaintiff has devoted no time to defending these claims and they do not appear to be central to the harms Plaintiff suffered, the court will give them only brief consideration.

natory practices including discharge on the basis of disability); *see also Stroud v. Harrison*, 131 N.C.App. 480, 487, 508 S.E.2d 527, 531 (1998). Plaintiff's equal protection claim under Section 19 of Article I of the North Carolina Constitution must therefore be dismissed.

■ Plaintiff's due process claim arises under the "Law of the Land" Clause of Section 19, which provides that "[N]o person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. Art. I, § 19. The Law of the Land Clause is synonymous with the Due Process Clause of the Fourteenth Amendment, *A–S–P Assocs. v. City of Raleigh*, 298 N.C. 207, 213, 258 S.E.2d 444, 448 (1979), and both are interpreted in the same manner. *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 435 n. 6 (4th Cir.2002); *Simeon v. Hardin*, 339 N.C. 358, 451 S.E.2d 858, 871 (1994); *In re Moore's Sterilization*, 289 N.C. 95, 221 S.E.2d 307, 309 (1976).

■ To the extent Plaintiff has raised a substantive, rather than procedural, due process claim based on the alleged violation of her free speech rights, that claim is merely a repetition of her claims under Sections 12 and 14 and will be dismissed. *Myers v. Town of Landis*, 957 F.Supp. 762, 770 (M.D.N.C.1996); *see also Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 813, 127 L.Ed.2d 114 (1994) (holding that where a particular constitutional provision provides explicit protection against a government act, claims should be analyzed under that provision, and not under substantive due process) (plurality opinion); *accord Wilkes v. Young*, 28 F.3d 1362, 1364 n. 2 (4th Cir.1994). Similarly, to the extent Plaintiff had any right to continued employment, it was not protected by substantive due process, which protects only fundamental constitutional rights. *See Myers*, 957 F.Supp. at 770 (holding that the plaintiff's "right to his job, if any, was created by state contract law, and does not implicate substantive due process") (citing *McKinney v. Pate*, 20 F.3d 1550, 1556 (11th Cir.1994) (en banc)).

■ Finally, Plaintiff cannot make out a claim for denial of procedural due process. A right to procedural due process is dependent upon having a constitutionally protected liberty or property interest. *See McDonald's Corp. v. Dwyer*, 338 N.C. 445, 447, 450 S.E.2d 888, 890 (1994). Employment contracts in North Carolina are presumed to be terminable at will by either party, *Presnell v. Pell*, 298 N.C. 715, 723–24, 260 S.E.2d 611, 616 (1979), and employees who have only an at will employment contract have no property interest in that employment, *see McCallum v. North Carolina Coop. Extension Serv.*, 142 N.C.App. 48, 56–57, 542 S.E.2d 227, 234 (2001); *Peele*, 90 N.C.App. at 451, 368 S.E.2d at 894–95. Plaintiff has not alleged that she has an employment contract other than one terminable at will and as such has no property interest on which to base a due process claim. Plaintiff's due process claim under Section 19 of Article I of the North Carolina Constitution will therefore be dismissed.

■ Plaintiff's claims against Clarke under the state constitution must also be dismissed. North Carolina does not recognize claims for violations of the state constitution against persons sued in their individual capacities. *Corum*, 330 N.C. at 787, 413 S.E.2d at 292. While North Carolina does recognize claims under the state constitution against officers named in their official capacities, *id.* at 788, 413 S.E.2d at 293, the claims against Clarke in her official capacity are duplicative of Plaintiff's claims against the county and should be dismissed. *See Disher v. Weaver*, 308 F.Supp.2d 614, 628 n. 10 (M.D.N.C.2004)

(citing *Love–Lane v. Martin*, 355 F.3d 766, 783–84 (4th Cir.2004)). As such, all of Plaintiff's claims under the state constitution against Clarke will be dismissed.

Plaintiff also seeks punitive damages under her state constitutional claims. The North Carolina Supreme Court, however, has held that "in the absence of statutory provisions to the contrary, municipal corporations are immune from punitive damages." *Long v. City of Charlotte*, 306 N.C. 187, 208, 293 S.E.2d 101, 115 (1982). After the dismissal of Plaintiff's state constitutional claims against Clarke, only her claims against the County remain, and under *Long* no punitive damages are available. As such, Plaintiff's claim for punitive damages for violation of the North Carolina Constitution will be dismissed.

### E. Intentional Infliction of Emotional Distress

 Plaintiff has also alleged that the conduct of Clarke and the County amounts to intentional infliction of emotional distress. The essential elements of a claim of intentional infliction of emotional distress are "1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress." *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quoting *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981)). Conduct is extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 493, 340 S.E.2d 116, 123 (1986) (quoting Restatement (Second) of Torts, § 46 cmt. (d) (1965)). Whether conduct meets this standard is a question of law. *Lenins v. K–Mart Corp.*, 98 N.C.App. 590, 599, 391 S.E.2d 843, 848 (1990).

This court has noted that only "[r]arely will conduct in the employment context rise to the level of outrageousness necessary to provide a basis for recovery." *Swaim v. Westchester Acad., Inc.*, 170 F.Supp.2d 580, 584 (M.D.N.C.2001) (quoting *Wilson v. Southern Nat'l Bank of N.C.*, No. 95–1831, 1996 WL 445088, at *5 (4th Cir. Aug.8, 1996)). For example, this court has declined to find extreme and outrageous conduct when a defendant notified an employee a month after his heart attack that he would be fired if he did not return to work, told him he was too old to perform his job, and allegedly fired him in violation of federal and state discrimination laws. *See Atkins v. USF Dugan, Inc.*, 106 F.Supp.2d 799, 810–11 (M.D.N.C.1999). North Carolina courts have been similarly reluctant to extend intentional infliction of emotional distress liability in the workplace.[14] *See, e.g., Hogan*, 79 N.C.App. at 493–94, 340 S.E.2d at 122–23 (finding no extreme or outrageous conduct when a supervisor screamed, called employees names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains); *see also Groves v. Travelers Ins. Co.*, 139 N.C.App. 795, 800–01, 535 S.E.2d 105, 108–09 (2000) (McGee, J., dissenting)

---

14. Indeed, North Carolina courts have often found extreme and outrageous conduct only in cases involving sexual advances, obscene language, and inappropriate touching. *See Guthrie v. Conroy*, 152 N.C.App. 15, 22–23, 567 S.E.2d 403, 409–10 (2002) (collecting cases). Simply put, plaintiffs must put up with "mere insults, indignities, and threats," and "must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate or unkind." *Hogan v. Forsyth Country Club*, 79 N.C.App. 483, 493, 340 S.E.2d 116, 123 (1986) (quoting Restatement (Second) of Torts, § 46 cmt. (d) (1965)).

(collecting cases), *rev'd per curiam on reasoning of dissent,* 354 N.C. 206, 552 S.E.2d 141 (2001).

In this case, Plaintiff has alleged harassment and intimidation on the basis of her disagreements with Clarke, as well as continued harassment by Defendants after Plaintiff was on medical leave. (*See, e.g.,* Am. Compl. ¶¶ 38, 44, 54.) The North Carolina Court of Appeals has held that allegations that an employer fired an employee in retaliation for his exercise of his First Amendment rights did not rise to the level of extreme and outrageous conduct. *See Lorbacher v. Housing Auth. of City of Raleigh,* 127 N.C.App. 663, 676, 493 S.E.2d 74, 82 (1997), *overruling in part on other grounds recognized by Riley v. Debaer,* 144 N.C.App. 357, 362, 547 S.E.2d 831, 835 (2001). Moreover, this court has held that extreme and outrageous conduct was not present where a plaintiff alleged that the defendants demanded that she return to work despite the fact she had taken an approved leave of absence, terminated her in violation of the FMLA, and took such action although the defendants knew or should have known of the medical conditions of the plaintiff's husband. *Buser v. Southern Food Serv., Inc.,* 73 F.Supp.2d 556, 573 (M.D.N.C.1999).

■ Plaintiff contends that the repeated harassment constituted extreme and outrageous conduct because Defendants knew of Plaintiff's mental condition and were informed that continued harassment could worsen Plaintiff's condition. While there may be some cases in which a plaintiff's medical condition converts otherwise permissible conduct into extreme and outrageous conduct, Plaintiff's allegations here fail to meet the high hurdle established by North Carolina courts. *See, e.g., Hogan,* 79 N.C.App. at 494, 340 S.E.2d at 123 (affirming a grant of summary judgment against a plaintiff who alleged that, while she was pregnant, her supervisor required her to carry heavy loads, denied her pregnancy leave, refused to let her go to the hospital when labor pains began, and fired her when she thereafter left without permission). Because Plaintiff fails to allege extreme and outrageous conduct as a matter of law, her claim for intentional infliction of emotional distress must be dismissed.

### F. Negligent Infliction of Emotional Distress

■ Plaintiff has also asserted a claim for negligent infliction of emotional distress. Although Plaintiff sets this claim out in her complaint, she has not raised any argument to oppose its dismissal in her brief in opposition to Defendants' motion to dismiss. Having failed to respond to this portion of Defendants' motion, the motion as to this claim will be deemed unopposed. *See* LR 7.3(k). While unopposed motions "will ordinarily be granted without further notice," *id.,* the court must still verify that dismissal is appropriate under the circumstances. *See Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir.1993) (holding that, where a motion for summary judgment is unopposed, the district court must nonetheless ensure that the moving party is entitled to judgment as a matter of law).

■ To state a claim for negligent infliction of emotional distress, Plaintiff must allege that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress ... and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.,* 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). Included within these elements is a requirement that the defendant have committed negligence, including the failure to exercise due

care "in the performance of some legal duty owed to plaintiff." *Guthrie v. Conroy*, 152 N.C.App. 15, 25, 567 S.E.2d 403, 410 (2002) (citing *Gordon v. Garner*, 127 N.C.App. 649, 661, 493 S.E.2d 58, 65 (1997)). Plaintiff's complaint makes no reference to any duty that Defendants owed her other than those established in the other statutes under which Plaintiff has sued. The lack of a duty from a defendant to a plaintiff is fatal to a negligent infliction of emotional distress claim. *See Guthrie*, 152 N.C.App. at 25, 567 S.E.2d at 411. Moreover, aside from a single conclusory allegation, *see* Am. Compl. ¶ 105 ("Through the conduct of the Defendants set forth herein, the Defendant was willfully and wantonly negligent."), Plaintiff's complaint recounts only intentional acts by Defendants. Even taking all these allegations as true, they demonstrate intentional acts for which Plaintiff has made other claims; they do not show negligent acts required for a claim of negligent infliction of emotional distress. *See Mitchell v. Lydall Inc.*, No. 93–1374, 1994 WL 38703, at *3 (4th Cir. Feb.10, 1994). Plaintiff's claim of negligent infliction of emotional distress fails as a matter of law and must be dismissed.

### G. Wrongful Discharge in Violation of Public Policy

Plaintiff also alleges that her termination was in violation of the public policy of North Carolina as stated in the North Carolina Persons With Disabilities Protection Act, ("NCPDPA") N.C. Gen.Stat. § 168A–1 *et seq.* and the North Carolina Constitution.

The NCPDPA specifically declares that "the practice of discrimination based upon a disabling condition is contrary to the public interest and to the principles of freedom and equality of opportunity." N.C. Gen.Stat. § 168A–2. A cause of action exists for one who is discharged or otherwise discriminated against on the basis of disability. *Id.* § 168A–11(a). Claims under the NCPDPA, however, are limited in that

> [n]o court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under ... the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq., as amended, or federal regulations promulgated under that Act, involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter.

*Id.* § 168A–11(c). Courts will thus dismiss claims under the NCPDPA when they arise out of the same facts as a claim under the ADA. *Cone ex rel. Cone v. Randolph County Sch.*, 302 F.Supp.2d 500, 514 (M.D.N.C.2004), *aff'd*, No. 04–1319, 103 Fed.Appx. 731 (4th Cir. July 16, 2004). Since Plaintiff's claim under the NCPDPA arises out of the same facts and circumstances involved in her ADA claim, it fails as a matter of law and Defendants' motion to dismiss as to this claim will be granted.

Plaintiff also asserts a claim for wrongful discharge in violation of the public policy expressed in the North Carolina Constitution. Such a claim merely restates the same claims Plaintiff has made directly under the North Carolina Constitution. This claim will therefore be dismissed as duplicative.

### IV. CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that Defendants' motion to dismiss [6] is **GRANTED IN PART** and **DENIED IN PART**.

Specifically, Plaintiff's § 1983 claims based on the Equal Protection Clause and Title VII, for punitive damages under § 1983, for failure to reinstate under the FMLA, for violation of Sections 1 and 19 of Article I of the North Carolina Consti-

tution, for punitive damages under the North Carolina Constitution, for intentional infliction of emotional distress, for negligent infliction of emotional distress, and for wrongful discharge in violation of the NCPDPA and the North Carolina Constitution are dismissed. Of the remaining claims, all of the claims against Clarke in her official capacity are dismissed, and all of the claims against Clarke in her individual capacity are dismissed except for the claim of discrimination or retaliation under the FMLA.

In sum, the following claims remain in this lawsuit: A claim under § 1983 for violation of Plaintiff's First Amendment rights against the County, an ADA discrimination claim and an ADA retaliation claim against the County, an FMLA discrimination/retaliation claim against both the County and Clarke in her individual capacity, and claims against the County under Sections 12 and 14 of Article I of the North Carolina Constitution.